# Gerald A. Shiener, M. D.

Distinguished Life Fellow, American Psychiatric Association
251 East Merrill
Suite 230
Birmingham, Michigan 48009

(248) 645-5155
Telephone

(248) 645-2665
Telecopier

September 26, 2022

Ronald W. Chapman, Sr., Esq., M.P.A., LL.M
Chapman Law Group
1441 W. Long Lake Rd.
Suite 310
Troy, Michigan 48098

Re:    John Daniel Whelan, M.D.

Dear Mr. Chapman:

I had an opportunity to conduct a psychiatric evaluation on John Daniel Whelan on September 21, 2022. He was referred to me by your office for the purpose of performing a psychiatric evaluation relative to criminal charges that he has pending against him in Federal Court.

In addition to conducting a psychiatric evaluation, I have had an opportunity to review two packets of discovery - one provided to me by your office, and one provided by the Federal Government.

In addition to conducting a psychiatric evaluation, I also conducted cognitive assessments using the Montreal Cognitive Assessment (MOCA), the Folstein Mini Mental Exam, and the Frontal Assessment Battery.

I am also in the process of obtaining medical records from John Daniel Whelan, M.D. from Dr. Whelan's provider at SSM Health through the Fond du Lac Regional Clinic, and St. Agnes Hospital in Fond du Lac. I have not received those records and reserve the right to supplement my report and my opinions based upon the findings of those records.

Before proceeding with the evaluation the circumstances of the evaluation were explained in detail to the patient. The patient understood after this explanation that no medical treatment would be provided and that the information disclosed during the course of this evaluation was not to be considered privileged and would be disclosed to the consulting party. With that understanding, at the time of the evaluation I obtained the following history.

Diplomate, American Board of Psychiatry and Neurology          Added Qualifications in Addiction, Geriatric and Forensic Psychiatry, Psychosomatic Medicine

Case 2:21-cr-00005-BHL   Filed 12/13/22   Page 1 of 13   Document 74-1

History:

John Daniel Whelan was born September 4, 1946. He is a 76 year-old, white, divorced man currently living in Fond du Lac, Wisconsin. His last job was being self-employed in private practice, and he worked for Affiliated Counseling Center in Beaver Dam.

I would express the caveat that the patient is a limited historian. He describes that he was working for a County Community Mental Health Center as a Staff Psychiatrist and retired after 10 years of working there. He looked for work in the Fond du Lac area. He was offered a position at an organization called Affiliated Counseling as a Staff Psychiatrist.

This was a private clinic, and when asked how many therapists they had he states, "They had therapists coming and going". The patient was the only physician prescriber, and he states that they had four therapists, but he then goes on to state, "Maybe five or six", describing that the owner was a therapist as well.

The patient saw patients and evaluated them, and if they needed testing he would refer them to a therapist. He was working part time, and when asked his hours he states, "9 to 5 or 6:00 p.m. three days a week". He then increased his hours to four days a week, and he worked there for "a few years", perhaps three years.

He then describes that "suddenly" CVS Pharmacy and Walgreens Pharmacy "started giving me trouble". When asked to characterize that he states, "They were telling me what drugs I could and couldn't prescribe". When asked for the medications in question he describes Ritalin, Vyvanse, and Adderall (psychostimulants), and Buprenorphine (an opiate partial agonist that is used for medication-assisted treatment for Opiate Use Disorder).

He goes on to describe that he treated "lots of adolescents" who came to him and "wanted to get off opiates". In some cases, he prescribed Suboxone (a fixed dose combination of Buprenorphine - an opiate partial agonist, and Naloxone - an opiate antagonist not absorbed orally, but absorbed parentally and used to prevent a diversion of this drug for intravenous use).

He states that he then started to get calls from CVS "where everyone gets their drugs in Beaver Dam". He then goes into a discussion of how CVS was purchasing Walgreens "to eliminate the competition", and the pharmacists or their representatives would start telling him "what I could or couldn't prescribe". There was a pharmacist in Rhode Island who said that the patient was prescribing "more than other doctors". The patient tried to explain, "I'm a psychiatrist...I'm doing the same thing I did when I was working for the County. It's up to me to manage medications".

He describes that the pharmacies became "more aggressive". They would call him at

home, "I talked to them for one hour". They had his nurse talk to them and explain the kind of patients and diagnoses that they were seeing "our work". At this point the patient launches into a discussion of his work experiences and qualifications. He goes on to state that "they started a barrage of mail", mail that the patient had to go to the Post Office and sign for. There were warning sheets "not that I didn't discuss these things with patients". The pharmacies objected to "more and more medicines".

He stated the calling got "so obnoxious and constant" that he "gave up". He then states, "I was getting...what do you call those things where you unzip them and open them and there's a letter inside?". He was told to "quit" and to "do things their way" and to "adhere to the policies". He takes issue with this, "They never told me the policies", and he goes on to state, "I wouldn't let them tell me how to manage my patients".

He then said that he planned to retire and he would start seeing patients at his address in Green Bay, Wisconsin. The patient could only see them at home, and then he had an office in his nurse's home "her husband is an accountant". Every Saturday he would put in three to four hours and he would try to "taper off" his work, and then he "just quit". He sums up his reaction, "I didn't think I was doing anything wrong".

He was at his nurse's home and "the DEA showed up". He describes that "a Milwaukee Prosecutor" named Julie Stewart approached with "a houseful of goons with submachine pistols". He states that they "held us at gunpoint" referring to his nurse, his nurse's husband, and him. During this search, the security cameras were removed. He was placed in handcuffs. He states, "They handcuffed my nurse's 77 year-old husband".

When asked what charges he is facing he states, "It varies...it depends". He then launches into a discussion about his fees. When I attempt to refocus him he becomes irritable, "What's your Goddamned question?". At this point he loses his composure and becomes angry and irritable and states, "There's a story that has to be told....I want to tell my story my way". When I set firm limits on him he continues with his narrative.

When asked the charges he states, "I don't know what exactly...I have 15 charges. One is being a doctor...I'm charged with having a license and writing prescriptions which is my job". When I ask him to characterize the accusation he states, "They said I was selling controlled substances...it's bullshit. I charge for my services...I charge the same as anyone else", and he maintains that he charges the same "that I charged at the County".

When asked what kind of sentence he is facing he states, "I don't know...I don't think I did anything wrong...they never discussed it". He states that at a hearing it was mentioned that he would be "dying in prison". He then states, "I guess I'm facing life for doing nothing".

When asked to describe a plea bargain, he states that he understands it and states "yes" several times. He describes it as follows - "I promise I'll admit to some of the 15 counts...guilty to one or two offenses. Depending I will just get sentenced on that...I'll go to jail and serve my time. They offered to do away with the other charges....they don't match....these charges are trumped up".

When asked to describe the courtroom procedure, he states that there is a judge who is there to "decide the sentence". He "hands down the penalty by listening to my testimony...maybe they won't even listen". When asked to describe a jury and their role in the procedures he states, "They're supposed to be an arbiter whether I'm guilty...to listen to my story". When asked what evidence might be because he does not mention evidence in any of the things that the judge or jury might consider he states, "Whatever the police found...they're trying to pass off as evidence of a crime...they can lie all they want to".

When asked the role of his attorney he states, "To defend me...I don't know...I'm not an attorney. Supposedly if he tells the truth there's no evidence of any crime". When asked the role of the prosecutor he states, "She's supposed to create a case that looks as if she found evidence of a crime and throw me behind bars for life". He cannot explain why she would want to do that. He then spontaneously adds, "If there is no case she makes one up...whatever she says I'm guilty of".

When asked about competency to stand trial, he describes that as "the ability to think clearly and act appropriately...to present appropriately and to make a court presentation".

The patient describes that he has been living in Fond du Lac for a period of 10 years, and he is currently released under a "signature bond", which means he is not allowed to leave the country stating, "They took my Passport", and he is confined to "eastern Wisconsin".

The patient structures his activities of daily living by watching television, and when asked what he watches on TV he states, "Whatever I find interesting". He watches "sitcoms" and he listens to public radio which he thinks is "pretty good". He describes watching a story of the Nazis in World War II, and he watches programs like Nova (although he mentions this as public radio he really means public television), and he talks about Nazis infiltrating the country during World War II "with secret agents".

The patient describes his sleep as "okay" with no difficulty falling asleep, early morning wakening, or troubling dreams unless he is anxious about court proceedings. When asked his height and weight he states, "6 feet tall...I weigh too much" (255 lbs.). He gained weight because he has diabetes. He denies problems with his bowels.

The patient currently lives alone. When asked if he was married he states, "Oh yes", and when asked how many times he states, "About a dozen times". He describes that he is

Catholic, and when he is with a woman before he can have sex with her he must be married. He is unable to describe the periods of relationship with the sequences of his marriages. He has three children that he can describe - a daughter, 28 years old, who is a Registered Nurse in California. He states, "I raised her". He has a "stepdaughter", 23 years old, who attends the University of Wisconsin - Oshkosh and will graduate with a Registered Nurse Degree. He has a 34 year-old son is from "one of my early marriages...my first marriage". He is estranged from that child as well as her mother. They were together for two years, and he terminated the relationship because she was unfaithful. In spite of describing that these are his only children, he describes another younger child - a daughter who is in college.

Personal History:

By way of personal history, the patient was born in New York City on Flat Bush Avenue. He attended Natrona County High School in Casper, Wyoming. He is uncertain of the year of his high school graduation, "I'd have to figure it out...I think I was 18 when I graduated...no maybe I was 16".

He then attended University of Wyoming two years after he attended Casper County Community College. He attended that college for two years. He earned a Masters Degree from the University of Wyoming in "Experimental Psychology and Pre-Med". He attended the University of Colorado and took "Psychology related classes". He attended Montsurrat Medical School in the Caribbean through the American University of the Caribbean. He then transferred to a medical school in St. Lucia "in 1990 something...no 1987". He did a Family Practice Residency in Arkansas, and then he worked for SIU in Family Practice. He worked for Edgewater Hospital and Cook County Hospital studying Internal Medicine. He then went to the University of South Dakota and did a Fellowship in Child & Adolescent Psychiatry, and he went into private practice doing "locum jobs". He then gets somewhat confused describing places that he worked, but they were actually Locum Tenens clinical positions.
He denies being fired from employment. He has never collected Workers' Disability Compensation benefits. He has never been arrested before. He initially states that he has never been a plaintiff in litigation. He then states that his wife had a childcare business when he worked at Winnebago during his Psych Residency describing it as a "collections lawsuit".

The patient's mother died when the patient was 45 years old. She was in her 90's "maybe 87". She died of colon cancer. She was a homemaker. The patient describes her as a good mother and was quite close to her. The patient's father died when the patient was 44. He was in his 90's and died of colon cancer. He was "number two in charge of programs out west in Hydroelectric". The patient describes him as a good father and was quite close to him. He describes his parents marriage as a good one. He makes the statement, "They were good parents".

Prior Employment History:

By way of prior employment history, the patient had Locum Tenens jobs. He worked for Meriter Hospital in Madison, Wisconsin and for the Mayo Clinic (these are all Locum jobs), and then he worked for County Community Mental Health. He stated it was a "university hospital", and then he adds, "Well it's not a university hospital...it was a freestanding mental health center" in Green Bay, and he worked there for what he estimates to be four to five years.

When asked if he ever had any licensing issues he states, "Mostly by drug seekers that I wouldn't give drugs to". He was disciplined once stating, "I got as far as I could...I had a schizophrenic patient who wanted a billion dollars". He describes that this was a lawsuit and states that it was "dismissed". His license has never been suspended. He denies being sued for malpractice stating, "No...I have a perfectly clean record".

Past Medical History:

By way of past medical history, the patient's primary care physician is Daniel Johnson, D.O. at North Fond du Lac Hospital. He was hospitalized when he had a "bad fall" over Christmas. He sustained a head injury and had a CT of the head, and he was seen at Waupun Memorial. He had a tonsillectomy and adenoidectomy as a child.

His current medications are Januvia for diabetes, Glipizide for diabetes. vitamins - B12 and multivitamins, Meloxicam (only when I ask if he takes anything for pain). He denies taking anything for sleep, but then adds that he takes Temazepam (a sedative hypnotic) every night.

The patient does not smoke cigarettes. He is an occasional alcohol drinker and is CAGE negative. He denies the use of street drugs and denies using marijuana. He has never been in psychiatric treatment before, but when asked starts talking about his experiences in medical school and Psychiatry Residency. He denies any drug allergies.

REVIEW OF DOCUMENTATION

Review of documentation reveals an Indictment in the matter of the United States of America vs. John D. Whelan and Tina Montezon alleging that starting in January 2018 Dr. Whelan prescribed controlled substance from a residence owned by Tina Montezon in Fond du Lac, Wisconsin. The substances involved were Ritalin and Methylphenidate (psychostimulants used for the treatment of Attention Deficit Disorder), Buprenorphine (an opiate partial agonist used for the medication-assisted treatment of Opiate Use Disorder), Adderall (a psychostimulant used for Attention Deficit Hyperactivity Disorder), and Xanax (an anxiolytic). All of these drugs are "controlled substances".

They allege that Dr. Whelan signed prescriptions and gave them to Tina Montezon, that Dr. Whelan allowed patients to pick up prescriptions written for other patients, prescribed large quantities of Buprenorphine in conjunction with Adderall, used a preparation of Buprenorphine Subutex that is restricted to in-hospital induction and used during pregnancy, and made misrepresentations to the Federal Government in the course of an investigation.

Dr. Whelan had provided certain articles describing the barriers to the use of Buprenorphine. There are some notes that the patient made describing his involvement with certain patients for whom substances were prescribed, and there are some listings from the Government describing his involvement with the patients.

A Curriculum Vitae describes the patient's employment with Affiliated Counseling, Fond du Lac County Department of Community Programs, and his Locum jobs as a Psychiatrist or an Addiction Specialist.

Post-graduate training is difficult to determine - June 1996 to November 1998 - Soux Falls, South Dakota, University of South Dakota - School of Medicine, Department of Psychiatry Child & Adolescent Fellowship. July 1994 to June 1996 - Winnebago County Community Mental Health Institute - Adult Psychiatry Residency Program, and Edgewater Medical Center in Chicago - Internal Medicine Residency for one year in 1993 to 1994. In 1991 to 1993 - Southern Illinois University Family Practice Residency. The patient attended Spartan University School of Medicine in St. Lucia, West Indies.

There are scheduling documents, audio files describing the patient's interactions with patients, and videos of surveillance of the home at which the patient dispensed the prescriptions. There are numerous financial records.

There are descriptions of interviews with patients for whom Dr. Whelan had prescribed medication. The documentation indicates that Dr. Whelan "did not perform any tests for ADHD, and there were no drug screens performed at ACC". The patient also stated he was prescribed "benzodiazepines for leg cramps", but added that there were "no tests performed by Dr. Whelan to identify the reason for the cramps". There are other examples of patient descriptions in this regard.

There is a Consultation Report by R. Andrew Chambers, M.D., Associate Professor of Psychiatry and Director of Addiction Psychiatry Training Program at Indiana University School of Medicine. The document is 23 pages long and reviews individual encounters with patients - one being from July 25, 2020 where an undercover announces the date and a mission to procure prescriptions. The undercover enters a house with a female partner walking ahead of him. It's an appointment for the female partner where she receives a prescription. The undercover is attempting to get into the clinic as a new patient himself.

He is set up for the next appointment - August 22, 2020. This is clearly a residence, and the reviewer describes the setting as lacking in professionalism. He notes that transactions of prescriptions, appointment scheduling, and payments are brief and audible for all clients and are essentially devoid of clinical expertise, evaluation, or content. Conversations are limited to rapid negotiations about drug type and doses requested by clients. Comments from the staff describe FDA "crackdowns" regarding quantities of medication, disparaging "people making the rules...they don't know what's going on", and describing the clinicians as "we are licensed so we don't want them thinking we are giving too many pills".

He notes that there is a sign - "(1) If you are here to pick up your prescription you will have to have the money up front before we can them to you. No money...no prescription. (2) If you are not scheduled to come in today then your prescription is not ready. We are only doing limited people today. (3) With the FDA guideline there have been decrease in the doses of some of the medication. There is nothing we can do about it".

There is a conclusory statement that "Tina" (Dr. Whelan's co-defendant) states to a client, "And I have to technically write times on this, but you don't have to take it at that time" (provides direct evidence that Tina is writing prescriptions and is the principal decision-maker pertaining to the CS prescriptions).

The undercover is "proactive" in requesting a direct interaction with Dr. Whelan after the transaction stating, "It is clear that this was not viewed as a necessity to your planned part of the previous transaction". The interaction with Dr. Whelan is described as "unusual" with him showing "very little eye contact". Questions are superficial and sparse with long gaps of time between his words. It is noted that Dr. Whelan "seems unprepared and confused by their presence". He shows an unfamiliarity with the clients. He inquires about their charts. He conducts his interview "at a very slow pace" with prolonged pauses.


<u>MENTAL STATUS EXAMINATION:</u> On mental status examination, the patient presents the following picture:

<u>General Attitude and Behavior:</u> The patient is an obese, slovenly dressed, white male who appears older than his stated age. He is living in a condominium/apartment at 170 W. Pioneer Rd., Apt. 102 in Fond du Lac, Wisconsin. The residence is cluttered. The carpet is dirty, and the room smells of incense or air freshener. We sit at the dining room table which is cluttered with papers, pens, and other items. On the back of the door to the apartment are several Magic Marker statements instructing Dr. Whelan to lock the door and make certain it is locked when he leaves the apartment or when he enters the apartment.

Dr. Whelan's gait is slowed. His reaction time is markedly prolonged. His speech is rambling. His memory is poor for dates. He begins the interview stating, "I retired from

the County after 10 years", and when questioned what year he retired he cannot answer. He is perseverative in some of his answers. When questions are put to him, he will do his best to answer them in an over-inclusive fashion. When a subsequent question is put to him, he tries to answer it, but is answer is contaminated by the content of the prior question. He loses his composure and becomes irritable when I question him about his charges, and instructs me to "get the hell outta here" if I will not let him give me his narrative answer. When I set limits on him he states, "Okay...what's your goddamn question?, becoming profane. His hygiene and grooming are only fair. He is balding and he has food stains on his shirt.

**Stream of Mental Activity:** The patient is markedly over-inclusive of detail, and at times he is distracted and becomes tangential. When talking about his interactions with CVS and Walgreens, he notices the cat wandering into the living room. He states, "Do you want me to put the cats out?", and when talking further about his interactions with pharmacies he talks about his work experience and does not return to the topic of the question. His thinking is markedly disordered in this regard.

**Emotional State and Reactions:** The patient's affect is shallow in depth and constricted in range. The mood is mildly to moderately depressed. This is persistent throughout the course of the interview. Affect is sometimes inappropriate to thought content in that he becomes irritable and aggressive with a certain degree of lability.

**Mental Trend and Content of Thought:** There is a marked trend of denial and minimization. The patient does not seem to be aware of the seriousness of his situation, only stating that he understands that he is facing the prospect of "dying in jail", but attributing it to the malevolence of the United States Government and the prosecutor, and a lack of understanding of a physician's prerogative on the part of the Government. He reports limited avocational activities - watching television, and misreports watching "public radio" when he means public television. He has difficulty naming any shows that he watches only "whatever interests me", and giving one example of a Nova program about Nazis infiltrating the United States with spies during World War II. He denies any persistent difficulty with his sleep. He has gained considerable weight which he attributes to his diabetes. He denies any gastrointestinal symptoms. He is not currently sexually active - he lacks a partner, and reports no sex drive and no ability to experience pleasure. He denies any overt secondary psychotic symptoms, although there is somewhat of a paranoid trend to his conversation when he describes the intentions of the Government.

**Sensorium Mental Grasp and Capacity:** These are evaluated with several instruments including the Folstein Mini-Mental State Exam. The Folstein Mini-Mental State Exam is a screening tool used in general hospitals primarily to evaluate level of consciousness in the presence of delirium.

Of the three instruments used, this is the "easiest", and the patient is oriented, although

he initially reports the year as "1922". He is able to register three objects. He is able to spell the word "house" backwards, and he can perform Serial 7's. He is able to recall the three objects asked to remember previously. He is able to identify objects, repeat a sentence, and follow a three step command. When asked to write a sentence he writes "I am writing a sentence". His pentagon drawings are adequate - earning a score of 29 out of 30.

In the more challenging Montreal Cognitive Assessment, which does more to test higher intellectual functioning of left brain and frontal lobe function, the patient cannot complete the Visuospatial Executive Test which goes from 1 to A to 2, and when asked to pick what's next he draws a line to B, but then draws a line to 3, then from 3 to B, from B to 4, from 4 to 1, and 1 to 5 - omitting D and C. His cube drawing is poorly done, rotated, and he makes an error. His clock drawing is very poorly done and he does not draw a clock face, he does not put in numbers, and his hands are the same length with the arrow inverted - earning 0 points out of a potential 5.

He is able to name a lion, a rhinoceros, and a camel, and he takes two trials to recall a five word list. He is able to repeat five numbers forward and three numbers backward. He makes three errors when asked to tap every time he hears the letter "A" in a random series of 26 letters. He performs Serial 7's with one error. He is able to repeat two complex sentences. He can only generate seven words that begin with the letter "F" in 60 seconds. He is able to state the similarities between a train and a bicycle, and a watch and a ruler. When asked to recall the five words I asked him to say when learning the list, he tries to write down the words while I am stating them for him. When told that he can't do that, he attempts to remember them. Although he could register the five words after two trials, when asked to produce the five words his response is, "Don't you have to tell me the words first so that I can remember them?", and he has no recollection of having given them, and cannot recall any of them with a category cue or a multiple choice cue. He is oriented to date, month, year, day, place, and city - earning a score of 18 out of 30 - indicating a significant impairment in higher intellectual functioning and executive functioning.

The last and most complex test is the Frontal Assessment Battery. This is an 18 item test that tests frontal lobe function. The frontal lobe is the area of the brain that regulates emotion, controls impulses, and is involved in planning and executing complex tasks. When asked about similarities, he is able to state that a banana and an orange are both fruit, a table and a chair are "organic", and a tulip, a rose, and a daisy are flowers - earning 2 out of 3 points. When asked to say as many words as he can beginning with the letter "S", he gives nine responses - three of which are proper nouns - earning 2 points out of 3. When asked to do motor series programming with the Luria fist-edge-palm maneuver, he performs three alone, but then makes several mistakes. When given conflicting instructions, he makes more than two errors - earning 1 out of 3 points. When tested for inhibitory control, he makes more than two errors - earning 1 out of 3 points. When asked

to exhibit environmental autonomy, he is able to inhibit a handshake - earning 11 out of 18 - indicating significant frontal lobe impairment.

## DIAGNOSTIC IMPRESSION:

Axis I:      Major Neurocognitive Disorder, frontal lobe type, disinhibited and dysexecutive.

Axis II:     No disorder of personality is diagnosed.

Axis III:    Obesity.

Hypertension.

Non-insulin-dependent diabetes mellitus.

Arthritis.

Axis IV:     Psychosocial Stressors - Legal difficulties.  Severe.

Axis V:      Highest level of functioning over the past year - (GAF: 50).

## DISCUSSION

John Daniel Whelan is a 76 year-old physician who practiced Psychiatry with having completed a Fellowship in Child & Adolescent Psychiatry.  His Board certification is not listed on his Curriculum Vitae.

His employment reveals several positions as an Addiction Specialist and he is accused of operating and participating in a controlled substances "mill" and conducting inadequate examinations, prescribing controlled substances - primarily sedatives, psychostimulants, and Buprenorphine in an unprofessional setting without adequate documentation, adequate examination, and then misrepresenting his participation in such activities when interviewed by representatives of law enforcement through the Federal Government.

He describes multiple and serial romantic relationships, brief employment in the early parts of his career, and being advised multiple times by pharmacies that his prescribing habits and procedures were a matter of some question which he considered to be intrusive and unwarranted.  He is diabetic, obese, and gaining weight which indicates that his illness is under poor control, and he has had at least one fall where he has required hospitalization and evaluation with a CT of the head.

His mental status examination is characterized by disorganized, over-inclusive, and perseverative thinking, irritability with a narcissistic and grandiose trend to his conversation, demonstrating an inability to engage in any sort of self-observation and to reflect on his own conduct.

His cognitive testing shows marked impairments in higher level functions of impulse control, judgement, and executive function. He demonstrates significant constructional apraxia on design drawing. I have yet to receive any medical records or imaging studies, which may supplement my opinions.

Based upon the history I have taken, the examination I have performed, and the documentation I have reviewed, I would express opinions as follows:

In order to find a defendant competent, a court must find by a preponderance of the evidence that he or she has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and that he has a rational as well as factual understanding of the proceedings against him. Dusky v. U.S., 362 U.S. 402 (1960). This standard is stated slightly differently in 18 U.S.C. § 4241(d). Under the current federal statute, a defendant is incompetent if the court finds by a preponderance of the evidence that he or she "is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." See also, Incompetency to Stand Trial, 81 Harv. L. Rev. 454 (1967); Indiana v. Edwards, ___ U.S. ___ , 128 S.Ct. 2379 (2008).

It is my opinion that Dr. Whelan is presently suffering from mental disease or defect rendering him mentally incompetent to the extent that he unable to understand the nature and consequences of the proceedings against him, and to assist properly in his defense.

He is suffering from a neurocognitive disturbance - that is a brain disease that interferes with his ability to remember, retrieve information, and learn new information, process it and act on it in a consensually validated way.

Furthermore, his understanding of the nature of the proceedings pending against him is so rigid, concrete, and offered in such a perseverative manner that indicates to me, in conjunction with his poor performance on cognitive examination and measurement, that his brain disease interferes with his ability to understand those matters.

I would suggest to the Court that he is not competent to stand trial. Given his age and the nature of his neurocognitive disorder - that is Frontotemporal Dementia, I would consider

his condition to be permanent and not remedial by treatment, reeducation, or cognitive rehabilitation. I do reserve the right to modify my opinion based upon the review of medical records that I have requested.

As regards criminal responsibility, the federal standard for an insanity defense requires the defendant to prove, by "clear and convincing evidence," that at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts.

It would be my opinion that due to Dr. Whelan's neurocognitive disorder - that is Frontotemporal Dementia, he was unable to appreciate the wrongfulness of his acts and remained convinced that he was entitled to make prescribing decisions for his patients without regard to the Federal Guidelines for the use of such medications, and the required documentation, history-taking, and diagnostic procedures required.

If you have any further questions regarding my evaluation, diagnosis, or recommendations, please feel free to contact me at my office address.

Very truly yours,

Gerald A. Shiener, M. D.
Diplomate of the American Board of Psychiatry and Neurology
Added qualifications in Addiction, Forensic and Geriatric Psychiatry, Psychosomatic Medicine and Brain Injury Medicine

Medical Director Integrated Care and Consultation Liaison Services
Wayne State University Physicians Group

Chief of Psychiatry
Sinai Grace Hospital of Detroit

Professor of Psychiatry and Behavioral Neurosciences
Wayne State University School of Medicine

GAS/rll