**00:00:23**

**Reid:** Are you turning the lights off on me?

**Klevinskas:** Black chair. On the black chair.

**Reid:** Alright. Dr. Whelan?

**Whelan:** Yeah?

**Reid:** My name is Laura Reid. I'm with the Drug Enforcement Administration. I'm a Diversion Investigator, and this is my partner.

**Klevinskas:** My name is Julius Klevinskas. I'm also and Investigator with the Drug Enforcement Administration.

**Reid:** So…obviously this is a surprise to your morning. And-

**Whelan:** Yeah it is. Yeah.

**Reid:** Yeah.

**Whelan:** As a matter of fact.

**Reid:** Right. So, um…

**Whelan:** Lauren Reid, was it?

**Reid:** Laura Reid. R-E-I-D. We'll give you business cards too.

**Whelan:** Ok.

**Reid:** Before we leave, ok?

**Whelan:** And Julian who?

**Klevinskas:** Julius Klevinskas.

**Reid:** Yeah, I'll give you my card now. Julius, do you have yours?

**Klevinskas:** Yes, ma'am. Just give me one second.

**Whelan:** Thanks.

**Reid:** Yeah, sure.

**Klevinskas:** Here's my business card.

**Whelan:** Ok.

**Reid:** So, before we get started, I believe the Agents who, and Task Force Officers, who came in initially told you that you're not under arrest. You're not being held here. You're free to leave…um…but, obviously, we're here for a reason.

**00:02:13**

**Whelan:** Mm-hmm.

**Reid:** We want to be able to talk to you about and explain our – the situation, and try to get, you know, the, your side of the things that we're here for. Right?

**Whelan:** MM-hmm.

**Reid:** Give you the opportunity to talk about that. And so…um…we have questions. We will record it for transcribing, if we need to, purposes. It is kind of general practices for your protection and ours. Right?

**Whelan:** Mm-hmm.

**Reid:** That this is recorded.

**Whelan:** Right.

**Reid:** So, it's approximately 7:57 AM. Um…so, we just want to start out with some basic information. Ok?

**Whelan:** Yeah.

**Reid:** Where, um, where do you work? Where is your employment?

**Whelan:** Affiliated Counselling in Beaver Dam.

**Reid:** Ok. What's the address there?

**Whelan:** Uh…I don't know. We just moved to a new building.

**Reid:** Oh, did you?

**Whelan:** Uh…it's on Center St. But, the old address used to be 108 North Lincoln.

**Reid:** Ok. And, you know, honestly, I'll probably let Julius ask the majority of the questions. But, we're kind of just here. We'll both ask those. So, um, I'll let Julius kind of start.

**Klevinskas:** Sure. So you said new location, correct?

**Whelan:** Mm-hmm. Yeah.

**Klevinskas:** How long has that been? At the new location.

**Whelan:** About a year.

**Klevinskas:** About a year. And how long have you been working at Affiliated?

**Whelan:** Oh off and on. 10, 10 years.

**Klevinskas:** Ok. And what's your schedule like?

**Whelan:** Schedule?

**Klevinskas:** Yeah. Do you work every day?

**Whelan:** Uh, yes. Every day. Um…pretty much every day. I was originally hired part time, but it has gone into a full time job.

**00:04:17**

**Reid:** Is that like Monday through Friday, or?

**Whelan:** Monday through Friday.

**Reid:** Ok.

**Klevinskas:** What are your hours though?

**Whelan:** That's variable. 9 to 5. 9 to 5:30. 9 to 2 some days. That's about as much as I can say.

**Reid:** When did you start working there more frequently?

**Whelan:** Um…in 75 I think.

**Reid:** Oh in 1975.

**Whelan:** Yeah.

**Reid:** So you've been there full time for-

**Whelan:** A number of years.

**Reid:** Decades.

**Whelan:** Yeah.

**Reid:** Ok.

**Klevinskas:** Ok. And what do you do at Affiliated?

**Whelan:** I'm a psychiatrist. Child and adolescent.

**Klevinskas:** Ok.

**Whelan:** By training. But actually, I see everyone regardless of any problem.

**Klevinskas:** Do you have a – what, what's your medical experience?

**Whelan:** I'm a medical doctor.

**Klevinskas:** Ok. Any specialties or certifications?

**Whelan:** Uh…yes. I was licensed in the AMA. The American Psychiatric Association. Um…The Academy of American Child and Adolescence Psychiatry. Um…numerous…um…associate professor shifts on the way up. Um…to a higher degree. And I recently got a waiver, W-A-I-V-E-R, to um…prescribe – what do you call them? Controlled substances, Class III.

**Reid:** What are those?

**Whelan:** Uh…Class III. I'm not sure exactly. But, it would be any above…anything controlled. Anything that has to be reported to the DEA. We have PDP.

**Reid:** What's that?

**Whelan:** Uh, electronic physician databank. And any transitions, uh…taking place, as far as someone came into the office and uh, wanted Suboxone, which is chiefly. In that case, what I would prescribe. And if they're sincere in getting off of opiates or what – I think they are. But, they see Carol Roddy – R-O-D-D-Y – who is our AODA specialist.

**00:07:26**

**Reid:** R-O-D-D-what?

**Whelan:** R-O-D-D-Y.

**Reid:** What kind of specialist did you say?

**Whelan:** Drug and alcohol.

**Reid:** Ok.

**Whelan:** She has several degrees of her own.

**Reid:** Is she like a counselor?

**Whelan:** Yes. AODA counselor.

**Klevinskas:** Ok. So just to clarify, you prescribe Suboxone at Affiliated?

**Whelan:** Yes.

**Klevinskas:** Ok. What other controls do you prescribe?

**Whelan:** Well. Adderall…um…for school kids…uh…it's a controlled substance. Um…oh lots of them, I would say. Um…Meloxicam…it's kind of an aspirin-like substance…um…it comes from the NSAID N-S-A-I-D molecule so it's basically an aspirin. That's even on the controlled substance list.

**Reid:** It is or it is not?

**Whelan:** It is.

**Reid:** Oh. Can you spell it again?

**Whelan:** M-E-L-

**Reid:** Mm-hmm.

**Whelan:** -O-X-C-I-C-A-M. That and no opiates. Um…Tramadol…is a pain med, but…it doesn't contain any opiates or…um…barbiturates.

**Reid:** So you prescribe that?

**Whelan:** Occassionally…depending on the case, the situation.

**Reid:** What would – yea – what would be a situation where you would prescribe Tramadol?

**Whelan:** Oh…say you were 63 years old and you had arthritis for the last 40 years…and you're in a nursing home…and without the use of the Tramadol, you would be…um…immobile, essentially. Very stiff in your joints and the Tramadol helps with ambulation, walking.

**Reid:** So in that situation, I mean, obviously psychiatry, mental health is more of your specialty. Why would they not be prescribed that by another medical professional versus a psychiatrist?

**Whelan:** No reason why not. They could go to anyone who is specialized in that area.

**Reid:** So you're specialized in Tramadol prescribing?

**Whelan:** Oh hell no.

**Reid:** Oh.

**Whelan:** I specialize in being a medical doctor.

**Reid:** Mm-hmm.

**Whelan:** And that…uh…is up to my judgement to what I prescribe.

**Reid:** Mm-hmm. You're right, it is.

**00:10:49**

**Klevinskas:** So, what about the other controlled substances? What would be a reason that you prescribe them?

**Whelan:** Um…Xanax is controlled. Or clonazepam. Or…um…lorazepam. Any of the benzodiazepines. Um…and that's about it without looking at lists.

**Klevinskas:** Right, but what would be a reason you would prescribe somebody Xanax or lorazepam.

**Whelan:** Xanax is a muscle relaxer. And, um…as in the case of arthritis, I mentioned. Um…it can be used to help people move about in a nursing home…or um…living by themselves. Um…it's anti-anxiety also. Um…many patients face crippling anxiety to where they're afraid to go out their front door, because of all the upset going on in the world. And um…a half a milligram of Xanax might allow them to get outside, go to Walmart, go some groceries, and get back in the house without too much upset. People in nursing homes use it quite commonly. There are some patients who tend to be difficult and even…oh…violent, confrontative. They become a problem on the nursing floor and often nurses are…uh…reluctant to approach a situation like that, unless, uh…the patient has been at least a little bit sedated first. It gets routine for…oh, sleep. 2mg would be a sleep dose. Um…half a milligram would be a dose just to simmer someone down. That often makes a difference between being able to work with someone or not.

**Klevinskas:** So, just to follow up with that, you would prescribe somebody a benzodiazepine for sleep?

**00:14:00**

**Whelan:** Uh…it's a common practice.

**Klevinskas:** What about Adderall? What is a reason you would prescribe somebody Adderall?

**Whelan:** Adderall? Uh, there are an entire range of stimulants, starting with Modafinil, which is in antidepressant mode of action, to uh…methylphenidate, to…Vyvanse – which is a new, uh, type of stimulant, which is supposed to provide a flat, even response for the school day.  Adderall tends to, whatever formula you should use, last about 4 hours and…it gives you an ability to um…gives the student, more ability to focus, concentrate…retain facts if they're motivated to do so.

**Reid:** So what percentage of your patients are, that are prescribed Adderall are children?

**Whelan:** Um…you'd have to go through the whole…

**Reid:** What's your guess?

**Whelan:** Mm…I have no idea, really. I don't keep the records. I don't keep statistics. A mother brings the child to me, and wants the child on Adderall. I might start with a mild one…and get feedback from the mother and the teacher.

**Reid:** Mm-hmm.

**Whelan:** And, uh…see if the grades are going up or not. Or if there's some other problem. Motivation for instance.

**Reid:** How is Adderall – or, how is ADD or ADHD diagnosed in your…in psychiatry, typically?

**Whelan:** Well, there are two ways you can test someone, extensively.

**Reid:** And what does that entail?

**Whelan:** Um…there are various tests…half a dozen in all. And you can give them the tests. It takes about an entire day.

**Reid:** Mm-hmm.

**Whelan:** And you could have a psych- a psychologist form an opinion as to whether they have Adderall to such a degree that it interferes with their job, their school, their home community. Um…another way is, uh-

**Reid:** Is there a technical term for that test, or?

**Whelan:** Uh, yeah there is. Let's see…I don't use it though. We don't have psychiatrists…

**Reid:** Psychologist, you mean?

**Whelan:** Psychologist.

**Reid:** At Affiliated?

**Whelan:** No we don't. Typically what I do is I give them a small dose.

**Reid:** Wait – so do you know what the test is called? Do you recall?

**Whelan:** The test?

**00:17:45**

**Reid:** Yeah.

**Whelan:** Mm…nope. Can't recall.

**Reid:** No. Ok. So, what's the other way to diagnose?

**Whelan:** Well, you give them a small dose, administered by the mother once a day in the morning. And you get feedback from the mother on a recurring improvements or worsening of the behavior. Uh, and they are usually in the position of reporting back to a judge at that time and they report to a parole officer.

**Reid:** Who's…the judge and the parole officer of who?

**Whelan:** The County.

**Reid:** Oh ok. Do you guys service County only, or?

**Whelan:** No.

**Reid:** You're, you're just saying part of your job at Affiliated is seeing patients under care of…

**Whelan:** Under authority.

**Reid:** Ok. But that's not everyone at Affiliated?

**Whelan:** No, no it's not.

**Reid:** Ok.

**Whelan:** Not everyone.

**Reid:** Got it.

**Whelan:** There's the drug court in town, which is an alternative to going to prison. And the people in custody can choose the drug court. In which case the drug court, a group of people who successfully got them through the procedures-

**Reid:** Mm-hmm.

**Whelan:** -themselves and graduate…uh…in 5 or 6 shifts…anything really.

**Reid:** Yeah. Ok. Quickly, I want to ask before we get off topic, and you kind of rattled some things off, but I want to get clarification on, kind of, you mentioned boards or additional certifications. Anything other than required CME's that you have any specialties in?

**Whelan:** Yeah. I'm a member of the AACAP, American Academy of uh…um…it's a board waiver-

**Reid:** Ok.

**Whelan:** -that allows you to prescribe Suboxone in cases who are referred to me for um…use of Suboxone.

**Reid:** Ok.

**Whelan:** People who are trying to get off opiates for instance.

**Reid:** Any other certifications, or boards, or specialty?

**Whelan:** Well I have an MD.

**Reid:** Right.

**Whelan:** I have a Master of Science.

**00:20:44**

**Reid:** Mm-hmm.

**Whelan:** Uh…in psychology.

**Reid:** Ok.

**Whelan:** The usual…

**Reid:** Uh-huh. Uh-huh.

**Whelan:** …pre-med courses.

**Reid:** Ok. I just wanted to get clarification. Go ahead.

**Klevinskas:** Like I said, do you see, you kind of mentioned that you prescribe Adderall to kids, do you prescribe it to adults as well?

**Whelan:** What?

**Klevinskas:** Do you prescribe Adderall to adults?

**Whelan:** Yes. A number of adults have very hard jobs. Um…welders for instance…for the marine shipyards. It's not unusual for them to have 8 hour shifts and be responsible for critical welds on navy ships…and uh…they would be a case where they need to be a peak of focus, concentrations…uh…attention. And it's not unusual for that occupation to use the med.

**Reid:** So…did these people say they have had concentration issues? Or is it just 'I need more concentration at work? Or are they…have they had a history of it? What is the…what if someone comes to you and they have a, like you said, an adult that is coming to you…I don't know how. What is, what is their symptoms saying that you say they need this?

**Whelan:** Over-attention, perhaps. Hyperactivity, although that tends to be more in a juvenile setting. Uh…attentiveness…um…we don't want them falling asleep while they're working on…

**Reid:** So is it more for them to stay awake, than, that it is for…the need for concentration?

**Whelan:** Oh…I'm, I'm not a welder. So, I can't say…what percentage is needed for concentration, what percentage is needed for staying awake, so on and so forth. I do know that they come to me, they describe a problem, and they report monthly.

**Reid:** What is the, what is the problem they describe, or do they just say 'I need some medic- or Adderall'?

**00:23:39**

**Whelan:** Well, usually, they say that they are falling asleep on the job. They have been warned several times by their foreman. Uh…they've been told to shape up or ship out. And it many cases it makes a difference, I gather they screened for…uh…users or abusers on the shipyard. And, um…if there are people they think are abusing, I imagine they have their own…uh…whirl-in, whirl-out pattern of whether they keep them or not. I don't know if they investigate their backgrounds or not when they're hiring.

**Reid:** So how do you make a decision on when, your medical decision on prescribing it? What's that based on?

**Whelan:** I talk to the the, family…uh…

**Reid:** Of the adults?

**Whelan:** Yeah. Relatives, the patient themselves…um…occasionally a supervisor…and I get a consensus of opinion…uh…from real-world individuals about…have they noticed any improvement in their reliability, and their quality of work, and less write-ups for absentees, and…uh…that kind of thing.

**Klevinskas:** So, just follow up with the family and everybody else happens after you prescribe Adderall?

**Whelan:** Say what?

**Klevinskas:** So, all the follow up that you do with family and, you know, the people that know the work that the people do that you prescribe the Adderall to, do you do this after you prescribe it or before you prescribe it?

**Whelan:** No, you have to start the trial with your best gue- guess as to what might be useful. The general rule is that you go slow…go low, go slow. You might start something fairly inoculate and see if it seems to be fairly effective and then there are limits on the high side too. You don't prescribe certain amount of any one substance. Although, there are guidelines…and I generally try not to exceed those guidelines.

**00:26:37**

**Klevinskas:** Ok. So, what's typically the usual dosage that you prescribe to somebody to start-

**Whelan:** Well, for Adderall, typically you would start off at 20mg twice a day, if it's an adult…and uh…20 3 times a day. Or in the case of the 30 mg pills, this would be for big heavy welder type, you, would prescribe 30mg 3 times a day.

**Klevinskas:** Do you prescribe any other controlled substance along with Adderall?

**Whelan:** Um…the state has an insurance case called the…um….Badger, and uh…can I get a glass of water?

**Reid:** Sure. I will have somebody grab that for you. What's your cat's name?

**Whelan:** Uh…that one is…Bella.

**Reid:** Bella.

**Whelan:** She's more friendly and curious, smaller one. And uh, Nala is the bigger cat.

**Reid:** Nella? Bella and Nella?

**Whelan:** Nala was named after the king of the lions in Lion King.

**Reid:** What's your daughter's name?

**Whelan:** Uh, Heather. And then I have a step-daughter, Samantha.

**Reid:** Oh you do, ok.

**Whelan:** Um…

**Reid:** Any other kids? Or just the two?

**Whelan:** Kids…for Heather, she is my only bio kid.

**Reid:** Ok.

**Whelan:** Uh…Samantha is adopted.

**Reid:** Oh she is? She's adopted? You're her step-dad and she's adopted?

**Whelan:** Yeah.

**Reid:** Ok.

**Whelan:** Uh…she, her mother, mother in the West Indies and I adopted her.

**Reid:** Wow.

**Whelan:** Brought her to the States, got her into nursing school. She's in UW-Oshkosh.

**Reid:** When did you adopt her?

**Whelan:** Oh Lord…uh…2, 3 years ago.

**Reid:** How old is she?

**Whelan:** 26.

**Reid:** How'd you adopt her when she's an adult?

**Whelan:** Well, it was a case of circumstances. Her mother had chronic renal failure.

**Reid:** Did you know her mother?

**00:29:36**

**Whelan:** Oh yes.

**Reid:** Ok.

**Whelan:** I was married to her.

**Reid:** Oh, ok. What's her mom's name?

**Whelan:** Loretta.

**Reid:** Loretta. Oh so you were married to her and she was your step-child, yeah.

**Whelan:** Uh…she wasn't my step-child in a biological sense. But, I had known her mother and her family for a number of years. And uh…we got to be friends, uh, with the whole family. And her mother passed out and went into the hospital one day. She had a hyperglycemic coma. She was diagnosed with, uh, an IDM-2, non-insulin dependent and got diabetes notice. And, I kept in touch with Loretta. We were married on the island. And uh, it became apparent to me that if she were going to have any kind of a chance in life, she would have to…uh…go to the States, go to school here and get an occupation. And, uh, she has. She is valedictorian of her class. And uh, has a small apartment on campus.

**Reid:** Good for her. Nice.

**Whelan:** Yeah. They usually, if you give them a chance, um…do pretty well.

**Reid:** Good. Ok, sorry, let's go back. You got your water. You're all good?

**Whelan:** I am.

**Reid:** Alright. Sorry. Off-topic. Cats and kids and…

**Klevinskas:** Alright. So getting back to Affiliated. So, how many patients do you usually see every day? On a regular day.

**Whelan:** Uh…yesterday, it was about 19 patients. And, we have walk-ins all the time. And uh…I would say on the average, oh probably 15 to 19 per day. There are forms to be filled out. PO evaluations…uh….teacher reports for kids who are in trouble and about to be thrown out. Um…insurance forms for people who were injured on the job and the company wants to know when they are going to return to work. And there you can only guess.

**00:32:40**

**Klevinskas:** How long do you usually spend with each patient?

**Whelan:** Do what?

**Klevinskas:** How long do you usually spend with each patient?

**Whelan:** How long do I what?

**Klevinskas:** How long do you see each patient? Do you see them for 15 minutes? Do you see them for half an hour?

**Whelan:** Oh.

**Klevinskas:** How long do you see them?

**Whelan:** Um…typically a progress note is a brief visit. Anything over 20 minutes to 30 minutes, the um…evals are more comprehensive, exploration of their back and maybe back problems and maybe, uh…relative testimony and also takes longer…30 minutes to 45. Uh, we try to get old records before we see the patients…um…

**Reid:** Their previous medical records?

**Whelan:** Usually in the prison systems-

**Reid:** Uh-huh.

**Whelan:** -sometimes criminal. Um, sometimes their institutions. And um…

**Reid:** What percentage of patients at Affiliated are from the court system?

**Whelan:** Oh Lord…a lot. Either through PO's who sent them there. Or State social workers…

**Reid:** So what's your guess? 50? 75%? 20? Just a general estimate.

**Whelan:** Mm…I couldn't guess. I don't classify when I see them as far as where they came from. If they're a prisoner, if they were a prisoner.

**Reid:** You don't find out? Where they came from.

**Whelan:** I'll ask if it seems pertinent.

**Reid:** Well, I'd think if they were referring it over that would be part of the paperwork, right? So you'd know.

**Whelan:** I would think so. Uh…and if it matters, I would ask if it seemed to be…anything relating to their treatment or lack of response to it.

**Reid:** Mm-hmm.

**Whelan:** Then I'd want to do more extensive questioning about their father, their mother, what kind of home they had, were they abused…um…were they made to be a drug runner…um…things like that.

**00:35:40**

**Reid:** Is this Bella? Now I'm just going to guess which one's what.

**Whelan:** Yeah, that's Bella. She's the more curious and adventure one.

**Klevinskas:** Alright, so does anybody else prescribe controlled substances at Affiliated?

**Whelan:** Do they what?

**Klevinskas:** Do they prescribe controlled substances? Or is it just you?

**Whelan:** We prescribe, but they have to go to pharmacies in the local area to, uh…fill the pharmacy and take it appropriately. And there, it's on them.

**Reid:** What's on them?

**Whelan:** Compliance on the patient.

**Reid:** For the medicine?

**Whelan:** Whether they take it or not and how closely they adhere to the instructions.

**Reid:** Are their contracts at Affiliated?

**Whelan:** I believe-

**Reid:** Drug contracts, or...

**Whelan:** I believe Carol Roddy, the uh, AODA counselor has contracts and uh, we do drug test people to see if they're positive for something they shouldn't be or not taking what they should be positive for. A lot of people who try to sell meds get them from us and show up with a negative UA. In which case you'd have to imagine it's going somewhere. And if it looks like it's a hopeless case like that, like if they have no motivation...um...to use it for self-improvement...you have to imagine it's being sold elsewhere. In cases like that, you can't do much without, with referring back to counselling for more work with Carol.

**Reid:** So how often do you drug test?

**Whelan:** Oh, we have a standard drug test kit, it's a plastic vial.

**Reid:** Oh, so it's done on-site.

**Whelan:** Yeah.

**Reid:** And, uh, how often is that done?

**Whelan:** Uh, whenever we have a suspicion that something is going on that shouldn't be.

**Reid:** Any other random times?

**Whelan:** Uh...we do a 10, a 12, a 6, depending on what you're looking for.

**Reid:** No, I mean any other times that you decide just random UDS or is it just based on suspicion?

**Whelan:** I'd say based on suspicion.

**Reid:** Ok.

**Whelan:** But there has to be something to give you that, uh, suspicion.

**Reid:** Uh-huh, and that would be in the medical records if a drug test was done.

**Whelan:** Yeah.

**Reid:** And you're saying there's a 6, 10, and 12 panel?

**Whelan:** Yeah.

**Reid:** Ok, do you discharge patients?

**Whelan:** Do I discharge them?

**Reid:** For, based on dirty urine drug screens for not prescribed, not taking what's prescribed, or-

**00:39:13**

**Whelan:** Yes. We give them two warnings. And if they receive a third one, they're out.

**Reid:** And is that for illegal substances and if they're not testing positive for what is prescribed?

**Whelan:** It could be either one, depending on what the problem is…uh…certainly if controlled substances are part of the issue…uh…like keeping a patient on Suboxone where they're trying to get off opioids…uh…that would be a case where you would watch them for a while. And they could be selling it to someone else. But, it's not a decision you make instantly. It evolves as the, uh, feedback from the patient is given to you.

**Reid:** Are the patients required to go to counselling, uh at that location specifically?

**Whelan:** They have been in counselling in prisons…and in-house counselling facilities…in the case of juveniles, they may have had longer-term counselling in the prison.

**Reid:** So while they're a patient at your location, are they required to see a counselor?

**Whelan:** I don't know the terms exactly that their PO works out.

**Reid:** No, I'm talking about you as a doctor, and what you're prescribing, these mental health medications. Do you require them to see a counselor for mental health issues?

**Whelan:** The patients?

**Reid:** Yeah.

**Whelan:** Yes. Depending on whether I think it's necessary or not.

**Reid:** Ok. So, it's dependent on the patient?

**Whelan:** Yeah.

**Klevinskas:** Ok, so I do want to backtrack a little. You said that 'we prescribe controlled substance'. So, who's the other person, the other people that prescribe controlled substances at Affiliatead?

**Whelan:** Oh, counselors make a suggestion. We function as a team basically. We have meetings once a month where we discuss troublesome patients and whether they're making progress or not. And, discuss putting them on drug screens for a time, and which drug screen, and how often.

**Reid:** Who's a part of this team?

**Whelan:** Carol.

**Reid:** Mm-hmm.

**Whelan:** Roddy. The owners. Um…Sandy Schelful and Dan something-or-other.

**Reid:** Can you say – can you spell Sandy's name? And then something-or-other too. Just kidding.

**00:42:29**

**Whelan:** S-C-H…L…No. S-C-H-E-L-F-U-L. I believe.

**Reid:** And Dan…you don't know Dan's last name?

**Whelan:** No.

**Reid:** Any other owners?

**Whelan:** He's more or less the bookkeeper and comes and goes on weekends.

**Reid:** But he's part owner.

**Whelan:** Yes, yes he-

**Reid:** Ok.

**Whelan:** -and Sandy both built the clinic over many years.

**Reid:** And are you – do you have any ownership?

**Whelan:** No.

**Reid:** Ok. And, uh, any other owners besides those two? Ok.

**Whelan:** No.

**Reid:** Who else is a part of the team meetings? Carol, Sandy, Dan.

**Whelan:** Uh…all the counselors. They're all invited there. About half a dozen of us. And…we're all required to attend a monthly meeting.

**Reid:** So, how many employees do you think are there?

**Whelan:** Mm…That is difficult. Because of the Covid epidemic we have had to work from home, over the phone…telehealth. And it's hard to tell who's on and who's not on a daily basis.

**Reid:** Uh-huh. When you do the calls. Do you always see patients in person there, or do you do where you talk over the phone and prescribe?

**Whelan:** Well, the people I know, the more reliable people, the ones who seem to have an interest in…getting off the meds, I will see personally. Many of them prefer personally. You can certainly read more of your person's behavior-

**Reid:** Uh-huh.

**Whelan:** -if you see them personally.

**Reid:** So, after Covid, what percentage of patients of, do you even, do you even not see patients? Or are you always just go to the clinic? Are you doing any telehealth?

**Whelan:** Oh yes. Yesterday was partially, yeah. Phone calls.

**Reid:** And then how do they get the prescriptions?

**Whelan:** They've been patients for years, and um…the prescription is sent in on an e-script, which is the internet. Um…it goes straight to the pharmacy.

**Reid:** So who inputs it if you don't have a computer here?

**00:45:23**

**Whelan:** Um…my secretary. We have a computer in the office.

**Reid:** But if you're here doing telehealth, how are they signing – how are you electronically signing the prescription?

**Whelan:** I don't know, but that would be up to Terry and Dan. They have to sign when they come in and sign when they go out.

**Reid:** Do you understand what I mean?

**Whelan:** No.

**Reid:** Ok, so electronic prescription, you still have to authorize it on a computer.

**Whelan:** Oh yes. And that's in my phone.

**Reid:** Ok.

**Whelan:** It's a number generator.

**Reid:** What's that called?

**Whelan:** So every prescription can be traced back to…uh…

**Reid:** So you have, is it like an app you have that you can sign electronic prescriptions?

**Whelan:** Yeah.

**Reid:** What's the app called?

**Whelan:** Uh…VIP I believe. Symantec. S-Y-M-A-N-T-E-C. I'm not sure what that stands for.

**Klevinskas:** So how does the app work?

**Whelan:** Uh, if I've determined to write a controlled substance, uh, prescription. Um…I'll write the prescription up. The nurse, or secretary in this case, has a desk next to mine. And, she listens to the conversation. She works for the County so she's fairly facile, so she knows all the lingo, the abbreviations. And, she feeds it into the online, uh, internet. (unclear) God. And, itself has a library of possible drugs and strengths. And we select what we want to prescribe and send it over the internet to every drug store in town.

**Klevinskas:** Do you do any paper prescriptions?

**Whelan:** Oh yes. And, um…many cases. Depends on what's most convenient.

**00:48:09**

**Klevinskas:** So, how do patients get paper prescriptions if you're having a conversation with them-

**Whelan:** Paper prescriptions. Well, you first have to pass the DEA test. Which is about 3 months long. And you go through a study and testing process. And if you keep your grades up 80%, um…you send in the answers by…um…computer. And they send you your grade by computer. And um…you're issued eventually, if you're successful, a um…oh…a waiver, which allows you to write for Suboxone, certain other Class III substances.

**Klevinskas:** Right. But that's not really what I'm asking. If you're seeing a patient over the phone, or not in person, right, or telehealth, do they ever get paper prescriptions instead of using the VIP app.

**Whelan:** They might. If they leave early, then we will mail them the prescriptions.

**Klevinskas:** Ok. And by 'we', do you mean you? Or does somebody at Affiliated mail it?

**Whelan:** The people at the front of the office.

**Klevinskas:** Ok, so who signs for those prescriptions then?

**Whelan:** Well, I would have to sign every prescription for it to be valid.

**Klevinskas:** Ok. But, if you're doing telehealth at home here, how would you sign those prescriptions?

**Whelan:** They would have to be signed. There wouldn't be any deviation from that policy.

**Klevinskas:** So you would personally sign them, nobody else signs them?

**Whelan:** Yeah. Every, uh, prescription has to be individually signed.

**Klevinskas:** Ok. So, how do you get paid at Affiliated?

**Whelan:** Uh…weekly paycheck based on my hours. Which is typically 9 to, oh 9 to 5 on a long day.

**Klevinskas:** What do you do with those funds?

**Whelan:** With the funds, pay bills.

**Klevinskas:** Right, but do you deposit them in a bank? Do you cash them out?

**Whelan:** Uh…I have the BMO Bank over here. And that is principally the one I use.

**Klevinskas:** Do you use any other banks?

**Whelan:** Uh…what is it? Wells Fargo in Waupun. But, that is so far away, I hardly use it.

**00:51:15**

**Reid:** Do you get bonuses? Or like a bi-weekly check, or?

**Whelan:** It's based exclusively on my hours. I've never been paid overtime.

**Reid:** Mm-hmm.

**Whelan:** I don't get anything personally out of selling one prescription over another prescription.

**Reid:** Mm-hmm.

**Klevinskas:** Ok, so earlier you mentioned that Tina was your secretary or nurse. So, how do you know her? Did you know her before you started working at Affiliated, or?

**Whelan:** She and I worked for 10 years together at…uh, Fond du Lac County Mental Health. And, uh…every patients…they're usually assigned a doctor…and a nurse responsible for at least the day shift, uh…duties…carrying out the orders. And I had been assigned on a regular basis to her for 10 years.

**Klevinskas:** Um, do you know Tina's last name by chance?

**Whelan:** Montezon. M-O-N-T-E-Z-O-N.

**Klevinskas:** Ok.

**Reid:** When was that? That you first met her at Fond du Lac County.

**Whelan:** Oh Lord…um…well go back 14 years. I guess it would be 2016…more than that. I'd say 2004, 2005 to the day I was first hired.

**Reid:** So that's how long you've known her.

**Whelan:** Yes.

**Reid:** Ok.

**Klevinskas:** So, I guess…could you tell me what she does at Affiliated? Other than act as a secretary for you?

**Whelan:** Uh…she does the same thing at Fond du Lac County. Uh…she's responsible for intakes for basic information.

**Reid:** She still works there?

**Whelan:** Yeah. Nights…um…I think right now it's…uh…3 o'clock to 11:30.

**Klevinskas:** Do you know which days she's there?

**Whelan:** Which what?

**Klevinskas:** Which days she works at the County?

**Whelan:** Uh…like most nurses she works on rotating shifts. Although she chose to work only nights so she could get more money for the support of her family. She's the only wage earner in her family.

**00:54:28**

**Klevinskas:** Do you work anywhere else? Other than Affiliated.

**Reid:** Oh, one more question. Does she have any kind of medical background? Or is she just a secretary?

**Whelan:** Uh, she's an LPN…licensed registry.

**Reid:** Ok.

**Whelan:** And that's generally a 1 to 2 year course…at an accredited nursing college.

**Reid:** Mm-hmm. Go ahead. Sorry.

**Klevinskas:** I said, do you work anywhere else other than Affiliated Counselling?

**Whelan:** No, I wouldn't say.

**Klevinskas:** What do you mean by that?

**Whelan:** Oh, there's always people who want to come up to you and see you outside of hours and I can't say that, uh…I do that. I generally refer them to…uh…Affiliated Counselling.

**Reid:** Who wants to come see you outside of the clinic?

**Whelan:** Uh damn…a few people. But few people who, who may have heard I'm a doctor and might come to me and ask for this, that, the other thing.

**Klevinskas:** But you, you don't see anybody outside the clinic. Is that what you're saying?

**Whelan:** No.

**Klevinskas:** No as in that's not what you're saying, or no as in you don't see anybody?

**Whelan:** They ask, but I don't see them. I don't have any facilities here to keep records or uh…see anyone.

**Klevinskas:** Ok, what about Saturdays? Have you seen any patients on Saturdays?

**Whelan:** Occasionally.

**Klevinskas:** So where do you see those patients?

**Whelan:** It depends on what's wrong and uh…generally I stay away from seeing people on Saturday.

**Klevinskas:** So you said you occasionally see people on Saturday. So, where do you actually see them? Do you see them at your home here?

**Whelan:** Uh, there would be people…who want meds…which I don't want to prescribe…at my home. And uh…I might agree to…see them…um…at another location. Tina's, uh, husband is an accountant and he has an office space, which I can use if I want to.

**00:57:19**

**Klevinskas:** Ok. And where is that?

**Whelan:** 90 Clinton St I believe. North Fond du Lac.

**Klevinskas:** And is that a business? Is that a business building? Or residential?

**Whelan:** Well he…lives in the house. But he has a tax business doing tax returns more or less once a year.

**Klevinskas:** Ok. So, you have a little office in there. Is that what you're saying?

**Whelan:** Yeah. He has faxes, computers…

**Klevinskas:** Ok. So you see patients from time to time at that little office there?

**Whelan:** Yeah. I say from time to time.

**Reid:** Every – what's time to time?

**Whelan:** Well, it depends on-

**Reid:** Every other Saturday? Every Saturday? Once a month?

**Whelan:** Oh, I'm not there every Saturday. Um…I really couldn't put any frequency on it. And I wouldn't see them unless they've been referred to me and didn't want to…see any other doctor.

**Reid:** Yeah, how do you get those patients on, for the Saturday visits?

**Whelan:** Mm…

**Reid:** How do they find you?

**Whelan:** Good question. Um…but the way they do it, apparently, is there's a list of people who have the waiver to prescribe the Suboxone…and, uh, other drugs of course too. Um…there are a whole string of drugs based on Narcan, nalbuphine. And um…if they come to the house or are referred to the house, then I might see them long enough to give them a prescription and they would then be responsible for going to a pharmacy and getting it themselves.

**Reid:** So you're saying there may be like a list of providers that are Suboxone that are online that they call.

**Whelan:** Oh yes.

**Reid:** Who do they call for that appointment? How do they get in touch with you?

**01:00:03**

**Whelan:** Well, I have no idea. But I understand you can look up through ASAM, the American Society of Addiction Medicine. Um…

**Reid:** But what number is on there? Who do they call to make an appointment on a Saturday?

**Whelan:** I don't know. I have never tried to look up a number on…

**Reid:** But how do you – who, who handles your appointments?

**Whelan:** Mm…probably Tina.

**Reid:** Oh ok. So Tina helps you out on Saturdays.

**Whelan:** Yeah.

**Reid:** And she does the – what does she do on Saturdays? What's her role?

**Whelan:** Uh…schedules patients…

**Reid:** Ok.

**Whelan:** …if it's one time and it's the only time they can get down and see me. She would schedule them.

**Reid:** Do you see patients on Sundays?

**Whelan:** No…and she might schedule patients, uh…Saturday. But that's about as far out of our way as we would go?

**Reid:** But what about when you see patients here in your apartment?

**Whelan:** Oh, I don't.

**Reid:** Oh, I thought you said that sometimes…you don't…

**Whelan:** No, I don't.

**Reid:** You don't prescribe here out of this house?

**Whelan:** No.

**Reid:** Patients don't come to pick up prescriptions here.

**Whelan:** No.

**Reid:** Ok.

**Klevinskas:** So, I actually had a question. So, on the front door it says 'please close the door when you leave' or something along those lines. Is that for somebody else that lives here? Or is that for…

**Whelan:** Mm…no. Nobody else lives here. It's a general reminder to keep the door shut. Otherwise people are always walking in, walking out.

**Klevinskas:** Which people?

**Whelan:** Anyone that passes by in the hallway…might get the wrong address and uh…they're going upstairs, trying to go downstairs.

**Reid:** But he means who is here, comes to visit you that would need to close the door?

**Whelan:** Well, anyone. Anyone that wants to can come and…it's not a social center here. I don't hold meetings. But anyone that wants to come and talk for a minute, uh, can get my opinion. They generally would leave after a minute or two. If they…

**Reid:** So sometimes there are patients that come. That want your opinion.

**Whelan:** No, I wouldn't say that there's a rule that there are. Uh…I don't do business here.

**01:03:09**

**Reid:** Who's going to ask you an opinion?

**Whelan:** You are.

**Reid:** That's true. I think that we're an exception to what your regular visitors might be, right?

**Whelan:** Well, I don't see that many visitors. And…

**Reid:** Do patients sometimes come here and get treatment, or ask questions, or pick up prescriptions?

**Whelan:** No. They don't.

**Reid:** Ok. But at Tina's they do.

**Whelan:** Uh…on certain hours if they're scheduled.

**Reid:** What are your hours there?

**Whelan:** Pretty variable if I'm over on a Saturday, I'll be there just hanging around. And um…they can come by anywhere from 10 to 2.

**Klevinskas:** So on a typical Saturday, for example, how many people do you see?

**Whelan:** Um…it could be as many as 10.

**Klevinskas:** Sounds like a pretty busy day then.

**Whelan:** Well 10 patients can be…

**Reid:** How long is your visits with them?

**Whelan:** Um…if it's something simple, 5 or 10 minutes.

**Klevinskas:** What do you mean by something simple?

**Whelan:** They would generally be referred to uh…the office downtown, Affiliated Counselling.

**Klevinskas:** So, you see patients on Saturdays and then you also see them at Affiliated?

**Whelan:** Yes. The two practices…are pretty much inter-related and inter-changeable as far as the patients I see.

**Reid:** Do patients that only go to Tina's?

**Whelan:** Mm…no. Not that I know of.

**Reid:** So all patients that come to Tina's on Saturdays also see you at Affiliated?

**Whelan:** Well, all is pretty inclusive.

**Reid:** 90? 80? 50?

**Whelan:** It depends on when they can get away, when they…

**Reid:** You're really bad at percentages. Come on. Give me an idea.

**Whelan:** Well, I'm not a statistician…

**Reid:** Well, I'm not either. You can give me a guess.

**Whelan:** Without knowledge of the books and numbers, it's like looking for…a patients records. You can read the chart, but even math is going to give you an overview.

**Reid:** Ok. So how many patients, do you think, are seen at both locations? Or if it's easier for you, how many patients are not seen at Affiliated? Percentage.

**01:06:22**

**Whelan:** Well, anyone who sees me…would be seeing Affiliated also.

**Reid:** Will see you there, at Affiliated-

**Whelan:** Yeah.

**Reid:** -and Tina.

**Klevinskas:** Ok. So, do you pay Tina for using her space?

**Whelan:** She's paid by Affiliated Counselling.

**Klevinskas:** Ok, so Affiliated Counselling, the owners know that you're seeing patients on Saturdays? And then also the same patients at Affiliated?

**Whelan:** I don't know. What I do with my personal time is my business.

**Reid:** Right. So Affiliated doesn't know about your patients on Saturdays, or that you see them there.

**Whelan:** I don't know-

**Reid:** So that means that Tina is not paid by Affiliated for Saturdays.

**Whelan:** No.

**Reid:** So how is she paid?

**Whelan:** Well, she generally is in the house when I go over there, and I typically go over there Saturdays.

**Klevinskas:** But you said that-

**Reid:** Who pays her?

**Klevinskas:** Right. You said that she helps you out with scheduling patients on Saturdays. So she works for free, or-

**Reid:** Yeah, so you pay her, right?

**Klevinskas:** -are you paying her? Is somebody else paying her?

**Whelan:** Well, I don't know that a lot of times she is paid.

**Reid:** So she does it pro bono? Man, she's a good friend.

**Whelan:** In many cases, she does. Yes.

**Klevinskas:** And what about the cases where she doesn't do it for free? Do you pay her? Do you give her…

**Whelan:** Well, you'll have to talk to her about that for how much she would do it…

**Reid:** So where does the money go for the patient visits? Who pays them? Is there insurance? How much are vists? What's the gist?

**Whelan:** Uh…insurance companies…uh…if any, would be dealt with by her. And she would be the only one who would know if there were any money involved.

**Reid:** So she collects the money for the vists?

**Whelan:** If there is any.

**Reid:** Ok.

**Klevinskas:** What do you mean by that? 'If there is any'.

**Whelan:** Uh…a lot of people just want favors and don't have money. And they might be asking for something to get them by until their usual…uh…scheduled visit at Affiliated.

**Klevinskas:** So you're saying you give them a little bit of controlled substances for free until they can be seen at Affiliated?

**01:09:14**

**Whelan:** I give them controlled substances for free?

**Reid:** Like you don't charge them an appointment.

**Klevinskas:** Right. You don't charge them until they come to Affiliated to see you again for a follow up visit.

**Whelan:** I don't give anyone controlled substances for free. What the hell do you think I am?

**Reid:** No, your appointment fee-

**Klevinskas:** Right. Your appointment fee – they come to see you, you don't charge them (unclear)

**Reid:** Yeah, like I'm going to go to the doctor, right? You have an appointment fee you pay. So, how are they, how do the patients pay for their visit to see you there on Saturdays?

**Whelan:** If they pay-

**Reid:** Mm.

**Whelan:** If they want to pay-

**Reid:** Mm-hmm.

**Whelan:** -they might…uh…pay…and they might not. It's not specifically a for-profit…uh…operation.

**Reid:** Mm-hmm. So if patients do pay, how do they pay?

**Whelan:** Mm, I think you'd better get by the 'if they do pay'.

**Reid:** Huh?

**Whelan:** You'd better get by the 'if they do pay' first. And I can't say that everyone pays.

**Reid:** Mm-hmm. So, if they do pay, do you get that appointment – do you get that – does Tina give you the money?

**Whelan:** For what?

**Reid:** Appointment fees if patients pay.

**Whelan:** First of all, you haven't established there are any fees, of any kind.

**Reid:** Well-

**Whelan:** Live chickens or anything else.

**Reid:** Right. Yeah right. I mean, but you have to pay.

**Whelan:** Oh, you don't-

**Reid:** Through some form. Either your insurance-

**Whelan:** You don't always have to pay.

**Reid:** Yeah, well, right. So are you doing this pro bono for patients on the weekend then? Normally at a clinic you're operating as a doctor, right? You have services you're providing. So, you know, that's only natural that you charge for your services through billing insurance. Is that what it goes through? Billing of insurance?

**Whelan:** Blowing…blowing up insurance?

**Reid:** Billing.

**Whelan:** Oh.

**Reid:** Yeah. Do you bill insurance?

**Whelan:** Not necessarily.

**Reid:** No? Ok.

**Whelan:** It's not a business. It's not operated as a business. It's not a for-profit endeavor.

**Reid:** Mm-hmm.

**Whelan:** You know, I think this has gone far enough. Unless you're going to arrest me on a charge, I want out of here. I have a whole day of work ahead of me.

**Reid:** Ok. Well, before we do that, um…we want to um…kind of discuss why we're here. And, so do you want to sit and kind of hear that before you go, or?

**01:12:17**

**Whelan:** Yeah. I'd like to have a good reason why you have to walk in on a 7 am visit, and uh…stop me on my way out the door while I'm trying to drive to work.

**Reid:** Ok. Well, I just wanted to let you know you voluntarily are in here, but we're willing to talk to you about why we're here if you want to stay. You're free to go, but we're willing to talk to you about that.

**Whelan:** Well, I didn't volunteer to be in here. I was in here because I was coerced into here.

**Reid:** No, I told you from the beginning that you're free to leave at any time.

**Whelan:** Oh yeah.

**Reid:** So…right?

**Whelan:** I see the same TV shows you do.

**Reid:** Yeah. Ok. Um…so…you do want to kind of discuss things? Or, um…

**Klevinskas:** You can do it.

**Reid:** So at this point, um, we're aware of your prescribing of, at the – on Saturdays at Tina's. You know. We don't just pop in here to…uh…just to do a search warrant for no reason, right? There's reasons that we're here.

**Whelan:** Search away.

**Reid:** Yeah, right. So, do you want me to keep going or do you want to leave?

**Whelan:** Well, I want to leave and get to work.

**Reid:** Ok.

**Whelan:** But, go on if there's any more to this.

**Reid:** Ok. So, you're operating, um – there's a lot of investigation tools that we take to determine whether prescriptions are legitimately prescribed or not. And, you're working on Saturdays. You're doing it for cash. And, we're aware of patients coming and not seeing you. So we want your statements of 'are you seeing patients', 'what are you prescribing there', um…the legitimacy to what you're prescribing. Do you want to talk about that?

**Whelan:** No.

**Reid:** Ok. So, I can't tell you all the investigation tools that we take, but based on the information that we have here, we are here because we have probable cause to believe that these prescriptions have not been issued legitimately. And, we are going to give you the opportunity at this point to surrender your DEA registration for cause. It is a form that I can show you. Um…it would not – it would discontinue your ability to write controlled substances. And the alternative is to go through a hearing, which is an administrative hearing done by and administrative law judge through DEA, and we present our case, you present your case, and um…the judge and administrator decide whether or not there's a public interest issue of you holding a DEA registration. That will be coming soon. So the option to provide for a surrender is to prevent that from going forward. Preventing that from going forward makes the – if you go through a hearing, it ends up on DEA's public website. Um, surrendering for cause would just stop the prescribing now, and you wouldn't have to go through that process. So, we want to give you that opportunity now.

**01:16:05**

**Whelan:** I don't think I'm doing anything wrong. And I don't think I should surrender my DEA license.

**Reid:** What if I told you that now's the time? You're 74. Right? You've had a long career. And now's the time to just be done with it. And to move forward, and not go, you know. Take this form that says,

'here', you know, 'based on alleged violations'. It's just alleged, um, 'I am giving up my DEA registration number'. This…you're retired. You don't need this anymore. You, we have sent in undercovers. We have done surveillance. We have seen the operation. We know exactly what's happening. And we got probably cause to be here from a judge, which means there's probable cause to believe what has happened here is not legitimate.

**Whelan:** Where? Here?

**Reid:** And – no you, you as a practitioner. So now's – you're 74 – it's o-, it's time to be done. You're done. It's one way or the other, it's – you're not going to be prescribing. So now's the time to just start making things – cut it off where it is. You're-

**Whelan:** Now, why am I not going to be prescribing? What offense are you going to find me guilty of?

**Reid:** Well, I don't find anyone guilty of anything. We just do our job of investigating and reporting that to the prosecutor, and that is left up to them what happens with this. We have probable cause to be here. We have probable cause to be at Tina's residence right now. Tina's house is being searched. This is not going away. So, it's time to just…retire and be done with your prescribing. You're 74. There's no more that's going to come of this for you.

**Whelan:** Uh-huh.

**Reid:** And this, today, we're giving you the opportunity to make this choice.

**Whelan:** What crime are you trying to prove I'm guilty of?

**Reid:** I don't prove anything. I'm an investigator. We did our finding – we do our findings, our investigation. That's turned over to a prosecutor to determine what happens going forward. That's not our decision. But this isn't going away for you. And so this is your time to make the first step of just stopping this, doing the right thing. You're 74 years old. It's time to move on.

**01:19:05**

**Whelan:** My means of livelihood is by prescribing just exactly as I prescribe.

**Reid:** You've seen patients, and given them without any questions. There's patients that just go in there and say 'I'm getting them off the street' and ask what their needed? No questions asked. No medical history. Nothing. No UDS. We know what's going on Dr. Whelan. We know it. You can tell us it's a 'maybe Saturday'. We've been doing this for long enough. We know more than you think we know. And this is your opportunity to start where it needs to start – which is to surrender your DEA registration.

**Whelan:** No. I'll, I'll go to court. And I'll tell my side. You tell your side. And we'll see if you've got enough to pin anything on me.

**Reid:** I just. I haven't even began to tell you the things that I have, and that's not – yes. You have to realize there's different layers here, ok? We have the administrative level, which is the, just the DEA registration. And that's what we want to address here today. Because we have no control over what happens with any other type of prosecution – civil, criminal – that's not our decision. But we want, in the interest of public safety, we…the stop – the prescribing of controlled substances has to stop. And,

this doesn't mean that just because you surrender it effects other things that are going on with the, on the prosecution end. But what we are concerned about now is you giving up your registration.

**Whelan:** I'm not giving up my DEA registration.

**Reid:** It's going to be, honestly, it's going to be taken away no matter what. So why not take the right step now and be done with it? It's – why go through the hassle?

**Whelan:** Because I don't think I'm doing anything wrong.

**Reid:** You don't think you're doing anything wrong. You-

**Whelan:** Outside of the scope of any other doctor.

**Reid:** Oh really? Ok. Do you ask medical questions?

**Whelan:** So unless is some tribunal on all doctors, we all do the same thing.

**Reid:** No. Dr. Whelan you know. You're a medical professional. You've went to school. You're smart enough to know that what you're doing, especially on Saturdays, is not legitimate. You're writing prescriptions for cash. Period.

**Whelan:** We don't have any set hours.

**Reid:** That doesn't – what does that mean about anything? You're going to tell me you're writing Adderall, Suboxone, and Xanax together when Sub- Don't. Listen. And knowing these patients are coming in as drug addicts, you're not doing urine drug screenings. You're not asking what their past history is. All you're doing is signing a paper. It's done. It's done. Whether or not you choose to do it now, it's done. It's time for you to move on. And we're giving you this as your first step, and that's why we're talking to you. We want you to have the control of taking this – make the right decision here. For public safety and for yourself. Because this, you signing that is a good faith effort.

**01:22:57**

**Whelan:** And not signing it-

**Reid:** And you can write non-controlled prescriptions. You can write your anti-depressants. That doesn't take away your medical license to prescribe non-controlled substances. You just can't prescribe the Adderall, the Suboxone, the benzos, anything that's controlled. So you still are able to prescribe non-controlled substances, which I'm sure as a mental health provider will keep you in business of prescribing.

**Whelan:** Uh…the substances I prescribe I'm licensed by the DEA to prescribe.

**Reid:** But that's why we're here. Because we're saying that it's not in the public interest for you to have authorization-

**Whelan:** And they have not indicated in any way, shape, or form-

**Reid:** We are right now, because we're here on a search warrant.

**Whelan:** You're a city cops.

**Reid:** I – do you see what DEA is? I said I'm with the Drug Enforcement Administration.

**Whelan:** So am I.

**Reid:** Oh you are?

**Whelan:** Big deal.

**Reid:** Ok. That's news to me.

**Whelan:** Well maybe you ought to do a little more research-

**Reid:** Mm.

**Whelan:** -and find out I work for them.

**Reid:** Do you? Interesting. So you, just…listen. I know you're smart enough to know this is in your best interest. And it's a good faith effort to move forward to understand. Do you have a form? So you can at least look at it. Actually, here it is. So, if you can – you're smart enough to read. 'In my…In view of my alleged failure to comply with the federal requirements pertaining to controlled substances, and as indication of my good faith and desiring to remedy any incorrect or unlawful practices on my part, I hereby surrender my cause for DEA registration'. This is, I mean, besides that there is nothing more. This is, like it says, 'good faith' effort.

**01:25:03**

**Whelan:** Well that good faith effort, I think, is going to have to be tested against federal drug administration.

**Reid:** That's who we are, and that's what we're here for.

**Whelan:** Mm-hmm.

**Reid:** Mm-hmm.

**Whelan:** And I think they should have some input into this, and I certainly am not going to give up-

**Reid:** That is what I am telling you.

**Whelan:** Mm-hmm.

**Reid:** I am with DEA.

**Whelan:** So am I.

**Reid:** Why do you keep saying that?

**Whelan:** Check it out.

**Reid:** Because you have a DEA registration?

**Whelan:** No.

**Reid:** Oh. What…what um…what role do you do at DEA?

**Whelan:** Same thing I do for anyone else. I see if they have a problem…um…I could do telehealth, I could prescribe-

**Reid:** Yeah, you have the – you have a DEA registration…is what you're saying.

**Whelan:** I can prescribe across state lines. I can have people referred to me. I can see them midnight…Sunday morning. I can see them Saturday afternoon. I see them at my…

**Reid:** You can take cash. You can ask no questions. You can sign off. There's no medical history obtained. You don't even see the patients half the time. We know what's going on Dr. Whelan. So this is your 'good faith' remedy here. First step, your opportunity to take this as the first step. I know you're smart enough to know this is the right thing to do.

**Whelan:** The right thing to do is take this to court – you against the DEA.

**Reid:** I am the DEA.

**Whelan:** So am I.

**Reid:** Ok. So…you want this to go to a public hearing.

**Whelan:** Yeah, I think so.

**Reid:** Ok. You want to hire an attorney. Go through all the work. Going through the Administrative process. Not only this. I don't know what the prosecutor's office is going to do. So, you're going to have two things going on. This shows, hey we're going back to the prosecutor's office. Listen, this shows we talked to Dr. Whelan. We talked to him. He made the good faith effort of surrendering his DEA registration for cause. That – they take that into account. We provide that information to them. Make the right first step, Dr. Whelan.

**Whelan:** I'm not going to surrender my registration. And for your information, I stopped prescribing any controlled substances a long time ago.

**Reid:** No. I mean. I just told you we went undercover there very recently. At Tina's house. Seeing you there. So, no. That's wrong. There's no point in lying to us.

**Whelan:** I'm not, not lying.

**Reid:** You're not, not lying?

**01:28:28**

**Whelan:** I'm not lying.

**Reid:** So if you're not prescribing controlled substances, why don't you make the decision to make a 'good faith' effort here?

**Whelan:** Because I work for the DEA registration, and I'm not going to give it up willingly.

**Reid:** Ok. Dr. Whelan when do you plan to retire?

**Whelan:** Or being bullied into it …um…probably within the next year.

**Reid:** Ok. So why go through this? You're 74 years old. Why would you go through this? Why not make your 'good faith' effort here?

**Whelan:** I don't think you have the grounds to…take my DEA license from me.

**Reid:** You don't think if we're sending in undercovers who say 'Hey, I get this on the street. I want this here'. They get increases from Tina.

**Whelan:** Mm-hmm.

**Reid:** Not even you. You don't even see the patient file. You don't ask any questions. You sign the prescriptions. You see people together. This isn't legitimate. Why are people coming from hours away to see you? And paying cash. And you ask no questions. That is not practicing medicine, and you know it.

**Whelan:** There's quite a latitude in practicing medicine. And, telehealth is one example. I don't see people there. I see them on my own schedule. I do more than write a prescription. Based on, I assume, background information…from investigators…many of whom work for the prison system. What I do for the DEA-

**Reid:** You don't work for the DEA. You have a DEA registration like you have a State license. You don't work for the medical board. You don't work for the DEA. You have a DEA registration, which a privilege of having a registration to do this, because you're a medical doctor. But you're not practicing as a medical doctor, and you damn well know that. And now is the time for you to give up your DEA registration and remedy this, as far as 'good faith' effort. I understand that maybe you were, maybe, in some point and some manner – I am not doubting that you practiced medicine in an appropriate manner. That could have happened. I don't know. But what I know is, what you're doing now, you're not doing that. And you know it. And this is where I go back to the prosecutor and say 'here', 'here's our investigation', 'here's our search warrant', 'here's what happened', 'Dr. Whelan made a good faith effort, and took responsibility in a manner of trying to make things go in the right direction', that you know it should be going in.

**01:31:26**

**Whelan:** I will agree to not writing controlled substances.

**Reid:** Great. That's all we need.

**Whelan:** But I…am not going to give up my certificate.

**Reid:** Ok. Why can't you just work using non-controlled substances?

**Whelan:** Uh…because it's stupid and ineffective.

**Reid:** You're 74 and retiring within a year. What does it matter at this point?

**Whelan:** What people matter.

**Reid:** Cut your losses.

**Whelan:** Why does it matter?

**Reid:** What are you – what money-

**Whelan:** Why care about it anymore?

**Reid:** We're going – we're going to move forward with the request, which will happen in no time, that your registration be revoked.

**Whelan:** Ok.

**Reid:** And based on our experience, and what we're, in our consultation, with Chief Counsel at DEA, this will be happening where your DEA registration is suspended. So we give you this opportunity to choose to make this decision now, and put it in your hands. Because I am telling you, based on what we've talked to them about this, and what we know on this case, this is going to be suspended in no time anyway. So why not make the 'good faith' effort to show that you're making that effort.

**Whelan:** I told you I would cease prescribing controlled substances.

**Reid:** Yes, but that means you don't have a DEA certificate anymore. You can't stop without us having that.

**Whelan:** I can stop right now.

**Reid:** But you need – what's the point of making 'good faith' effort and say 'he says he's going to but he won't sign his DEA registration for cause'? That's – I mean, that's not going to get you where you need to be.

**Whelan:** Well, until I talk to an attorney, that's going to be an 'I'll see you in court'.

**Reid:** Ok.

**Whelan:** Now, can I-

**Reid:** Have your attorney call me.

**Whelan:** Can I go, go to work?

**Reid:** You can go to work, but your car is being seized. So you're not, I'm – you're going to have to find another ride to work.

**Whelan:** Well, I ride with Tina.

**Reid:** Well, we're at Tina's residence right now, so.

**Whelan:** This is my residence.

**Reid:** I know it is. But we're also at Tina's. This is not going away Dr. Whelan. That's why I'm telling you to make the decision to make it better.

**Whelan:** I know this point is about Tina's, but, she doesn't live here.

**Reid:** Well, we're here. And as I just said, we're also at Tina's residence. Right?

**Whelan:** No.

**Reid:** So, we have 2 teams. So I'm just telling you, this isn't going away. There's a search being done at Tina's right now.

**Whelan:** Well, good.

**Reid:** Ok.

**Whelan:** I'd like my phone back so I can call her.

**Reid:** Well, we're seizing your phone too, because that's evidentiary value. It's included in the search warrant.

**Whelan:** You're going to pay me for that?

**Reid:** No, I'm not paying you. You can have your attorney call the prosecutor, or um…and, you know. That's that. We'll leave you the form. Contact Julius if-

**Klevinskas:** You change your mind.

**Reid:** You change your mind. And…that's that. This interview has ended at 9:29 AM.

\*\*\*

**End of Interview**