UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

                Plaintiff,

      v.                                    Case No. 21-CR-5 (BHL)

JOHN D. WHELAN,

                Defendant.

## UNITED STATES' CONSOLIDATED MOTIONS IN LIMINE

The United States of America, by and through its attorneys, Gregory J. Haanstad, United States Attorney, and Julie Stewart and Kevin Knight, Assistant United States Attorneys, hereby respectfully submits these consolidated motions in limine in advance of the trial in this matter, set to commence on October 16, 2023.

The parties met and conferred regarding these motions. For some motions, defense counsel indicated that they do not oppose the request but reserve the right to change their position based on developments at trial. Where the government's motion is thus preliminarily unopposed, the government has so noted below to aid the Court's analysis. The government has included these preliminarily unopposed motions herein despite the parties' current agreement to assist the Court and the parties in streamlining the trial and to preserve its arguments.

## I.    Background

Defendant John Whelan (a medical doctor) and Defendant Tina Montezon (a nurse) saw "patients" at a fraudulent "clinic" set up in Defendant Montezon's house on Saturdays beginning in 2018. At this fraudulent "clinic," the defendants collected cash in exchange for prescriptions for controlled substances. Individuals were given these prescriptions without any medical analysis and without a physical or mental examination. Indeed, some individuals simply picked up pre-signed prescriptions in exchange for cash without seeing Defendant Whelan at all. For his part, Defendant Whelan deposited approximately $285,000 in proceeds generated from this fraudulent Saturday "clinic" into his personal bank accounts from January 2018 to October 2020.

Defendants were indicted for this criminal activity. In January 2021, a grand jury charged them with conspiring to distribute controlled substances outside the course of a professional medical practice and not for a legitimate medical purpose, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846; maintaining a drug-involved premises, in violation of 21 U.S.C. § 856(a)(1); and making false statements to federal agents, in violation of 18 U.S.C. § 1001. *See* Dkt. No. [1]. They were arraigned in January 2021 and pled not guilty. *See* Dkt. No. [5].

Defendant Montezon pled guilty to multiple counts on August 31, 2023. *See* Dkt. No. [100].

Defendant Whelan's case is set for trial on October 16, 2023. *See* Dkt. No. [95].

## II.     The Government's Motions in Limine

In advance of Defendant Whelan's trial, the government's motions in limine are enumerated separately below.

*Motion in Limine No. 1: Potential Penalties & Plea Negotiations (Preliminarily Unopposed)*

As the Court is aware, the parties engaged in plea negotiations at earlier stages of this case. In fact, Defendant Whelan discussed these plea negotiations (and his potential exposure at sentencing) with the experts retained to assess his competency and sanity, and the Court heard testimony about those exchanges at Whelan's competency hearing. *See* Dkt. No. [107] 31:3-31:7; 152:16-153:4.

During trial, however, the Court should preclude any discussion of these plea negotiations or Whelan's potential penalties, as such material is irrelevant and highly prejudicial. *See* Fed. R. Evid. 410(a)(4); *see also* Fed. R. Evid. 403.

Case law similarly establishes that unless a jury has a sentencing role, such as in cases involving capital offenses, it "should be admonished to reach its verdict without regard to what sentence might be imposed." *Shannon v. United States*, 512 U.S. 573, 579 (1994) (cleaned up); *see also Aliwoli v. Carter*, 225 F.3d 826, 830 (7th Cir. 2000); *United States v. Lewis*, 110 F.3d 417, 422 (7th Cir. 1997) (noting that "the practice of informing juries about the sentencing consequences of their verdicts is strongly disfavored"). Seventh Circuit Pattern Jury Instruction 4.08 reflects this standard: "In deciding your verdict, you should not consider the possible punishment for the defendant[.]"

Because evidence regarding Whelan's potential penalties and plea negotiations are irrelevant to the jury's responsibilities, the United States respectfully moves for an

3

order precluding any witness or attorney from mentioning the same in the presence of the jury.

*Motion in Limine No. 2: Jury Nullification*

It is improper for the defendant to suggest, in any way, that the jury should acquit him even if it finds that the United States has met its burden of proof. *See*, *e.g.*, *Smith v. Winters*, 337 F.3d 935, 938 (7th Cir. 2003) (stating, in the context of the Illinois felony-murder statute, that "[a] defendant has of course no right to ask the jury to disregard the judge's instructions . . . [a] defense that the law he is charged with violating is a bad law that the jury should refuse to enforce is no defense at all"); *Gibbs v. VanNatta*, 329 F.3d 582, 584 (7th Cir. 2003) ("A defendant's lawyer is not permitted to argue to the jury that it should disregard the law; nor does the judge let on to the jury that it has the power to acquit in the teeth of the law"); *United States v. Bruce*, 109 F.3d 323, 327 (7th Cir. 1997) ("Jury nullification is not to be positively sanctioned by instructions but is to be viewed as an aberration under our system") (internal quotation omitted).

The United States accordingly requests that the Court forbid all forms of argument and questioning designed to induce jury nullification. The government particularly requests that the Court expressly preclude the jury from being exposed to evidence or arguments based on: (A) any collateral consequences, including any personal or familial hardship, that Whelan has faced or will face as a result of this prosecution; (B) the motives or actions of the prosecutors or agents in investigating this

matter; (C) Whelan's lawful conduct; or (D) any purported benefit Whelan or Montezon intended for narcotics customers at the "clinic." Taking each category in turn:

## A. Hardship Associated with Conviction

Any argument regarding the toll that a conviction or prison sentence may take on Whelan, or his family, as a result of his age, medical status, employment status, financial situation, medical licensure, or familial circumstances could only serve the improper purpose of invoking the sympathies of the jury and should be prohibited. *See Jinhuang Zheng*, 2017 WL 3434228, at *3 (N.D. Ill. Aug. 10, 2017); *see also* Fed. R. Evid. 403.

## B. Law Enforcement's Motivation

Defense counsel should be similarly prevented from advancing argument or posing questions designed to inject issues of law enforcement motivation into this trial. This is not an idle concern, as Whelan has previously expressed skepticism of law enforcement's motivation here. *See* Dkt. No. [107] 38:18-38:23; 153:18-23 (Whelan suggested charges are "trumped up" and "these people are out to get me").

Permitting unsupported argument, questioning, or testimony of this nature in the presence of the jury risks irreparable prejudice and confusion of the matters at issue. Courts have long noted that such arguments "can distort the search for truth and drastically affect a juror's impartiality." *United States v. Doe*, 903 F.2d 16, 25 (D.C. Cir. 1990). Further, evidence bearing on the government's decision to prosecute is "extraneous and collateral" and thus should be excluded on that basis. *See United States v. Johnson*, 605 F.2d 1025, 1030 (7th Cir. 1979) (affirming the exclusion of evidence

5

offered to show that the "indictment was a political instrument"); *United States v. Berrigan*, 482 F.2d 171, 174-76 (3rd Cir. 1973) (affirming exclusion of evidence relating to "discriminatory prosecution"). Indeed, the law is well-settled that claims of selective prosecution are to be resolved by the court and not the jury. *See United States v. Goulding*, 26 F.3d 656, 667 (7th Cir. 1994) (noting, even in the context of an entrapment defense, it was proper for the trial court not to "allow the defense to mount an inquiry into the mental states of the investigating officers since such an inquiry was irrelevant").

Questioning or argument about law enforcement's motivations in prosecuting this matter should therefore be prohibited. *See* Fed. R. Evid. 403.

C. Prior Lawful Acts

The Court should prevent any attempt to induce jury nullification by improper invocation of prior occasions in which Whelan acted in a lawful manner. For example, Whelan may attempt to argue that he did not commit the charged offenses because he acted lawfully when issuing other prescriptions not mentioned in the indictment or committed other good acts. Although the government acknowledges that a defendant may be permitted to introduce limited testimony concerning his or her background and introduce character testimony as permitted by Rules 404 and 405, the government moves this Court to preclude Whelan from improperly presenting evidence of specific prior good acts.

A defendant may offer evidence of his pertinent character trait to prove that on a particular occasion, the defendant acted in accordance with that character or trait. *See* Fed. R. Evid. 404(a)(2)(A). However, the defendant is limited in the form that evidence

6

may take: the defendant's pertinent character trait offered in the defendant's case "may [only] be proved by testimony about the person's reputation or by testimony in the form of an opinion." Fed. R. Evid. 405(a). In this regard, "[p]roof that a defendant acted lawfully on other occasions is not necessarily proof that he acted lawfully on the occasion alleged in the indictment." *United States v. Heidecke*, 900 F.2d 1155, 1162 (7th Cir. 1990). Evidence of other lawful behavior is irrelevant because acts of honesty do not prove an absence of dishonest acts. *See, e.g., United States v. Burke*, 781 F.2d 1234, 1243 (7th Cir. 1985) ("Evidence that the defendant frequently performs lawful or laudable acts does not often establish that some subsequent act is also lawful or laudable."). To hold otherwise would eviscerate the limitations of Rule 405, which is intended to prevent the series of wasteful "mini-trials" that would inevitably ensue if defendants were allowed to pursue this irrelevant line of inquiry. The Advisory Committee Notes similarly observe that proof of character by means of specific acts "possesses the greatest capacity to arouse prejudice, to confuse, to surprise, and to consume time." To the extent that Whelan intends to offer evidence regarding his character, he should be permitted to do so only in accordance with Rule 405(a)—not via evidence regarding other purportedly appropriate acts (including prescribing). *See* Fed. R. Evid. 403.

Nor can Whelan argue that the fact that he acted lawfully or issued lawful prescriptions to some patients means that other prescribing, including to the patients at issue in the indictment or at issue in the conspiracy, was necessarily lawful. Such if-then arguments veer into the territory prohibited by Rules 404 and 405. *See, e.g., United States v. Heidecke*, 900 F.2d 1155, 1162 (7th Cir. 1990) ("Proof that a defendant acted lawfully on

7

other occasions is not necessarily proof that he acted lawfully on the occasion alleged in the indictment."); *United States v. Burke*, 781 F.2d 1234, 1243 (7th Cir. 1985) ("Evidence that the defendant frequently performs lawful or laudable acts does not often establish that some subsequent act is also lawful or laudable.").

Similarly, Whelan should be precluded from arguing that the fact that he issued some lawful prescriptions means that he did not have the requisite intent to commit the crimes charged. *See United States v. Johnson*, 2011 WL 809194, at *4 (N.D. Ill. March 2, 2011) ("[E]vidence of specific lawful acts of Defendants is not properly introduced to show that Defendants did not have the requisite intent to commit the crimes charged").

D. Ostensible Benefits

The government anticipates that Whelan will seek to elicit testimony or introduce evidence regarding his and/or Montezon's desire to "help" their victim-customers at the "clinic." For example, the government understands that many of Whelan's victim-customers had substance abuse problems. The defense may argue that although Whelan prescribed controlled substances at the "clinic" in a way that deviated from the usual course of professional practice, Whelan did so because this presented a "less bad" option than having his victim-customers procure the narcotics he was prescribing "off the street."

Evidence regarding Whelan's customer base is, of course, admissible against him if offered by the government, because it demonstrates that he understood that he was dealing with a vulnerable population and nevertheless failed to comport with the usual

Case 2:21-cr-00005-BHL   Filed 09/21/23   Page 8 of 28   Document 117

course of professional practice by, for example, performing urinalysis or reviewing past medical records.

On the other hand, any argument that Whelan's crimes at the "clinic" were acceptable because narcotics obtained from a pharmacy are "safer" than those purchased on the street would impermissibly invite jury nullification. A defendant cannot negate his criminal intent by pointing to a supposed good motive for the instant offenses. *See United States v. Cullen*, 454 F.2d 386, 392 (7th Cir. 1971) (Stevens, J.) (when "improper motive is not an element" of the charged offense, then "evidence which merely relates to [a defendant's] good motive does not tend to disprove his admitted consciousness of wrongdoing"). The United States, therefore, asks this Court to issue an order prohibiting Whelan from eliciting testimony or advancing argument that the jury should acquit him because he was trying to provide his customers with "safer" narcotics. *See* Fed. R. Evid. 403.

The parties met and conferred regarding this request, and defense counsel indicated they cannot agree to the same at this time, though the parties will continue to discuss the issue in the hopes of reaching agreement.

*Motion in Limine No. 3: Discovery (Preliminarily Unopposed)*

In the presence of the jury, it is inappropriate for either party to request discovery from a witness or opposing counsel, move the Court for discovery, or otherwise comment on discovery matters. *See generally Thompson v. Glenmede Trust Co.*, 1996 WL 529693 (E.D. Pa. 1996) ("Rather than focus on the issues in the case, the jury may instead be misled by the irrelevant side issues of the discovery process. Therefore,

the Court will not permit either party to refer to the discovery process in the presence of the jury at trial."). The Government thus respectfully moves for any order precluding the parties from requesting discovery from witnesses or opposing counsel, moving the Court for such discovery, or otherwise commenting on discovery matters, in the presence of the jury.

Relatedly, if the Court finds, after a discussion outside the presence of the jury, that a party—either the government or the defense—failed to comply with a discovery obligation, "the court may . . . prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances." Fed. R. Crim. P. 16(d)(2). Therefore, the United States asks the Court to preclude the parties from introducing any evidence, making any statement, or asking any questions regarding exhibits that were not disclosed to the opposing party prior to trial.

*Motion in Limine No. 4: Defining Reasonable Doubt (Preliminarily Unopposed)*

In the Seventh Circuit, attempts to define the concept of "reasonable doubt" for the jury are improper. *See, e.g., United States v. Bruce*, 109 F.3d 232, 329 (7th Cir. 1997); *see also* Seventh Circuit Pattern Instruction 1.04.

Given the clear Seventh Circuit precedent on this issue (and the potentially differing practices in other jurisdictions in which counsel may practice), the Government moves this Court for an order prohibiting the parties from making any attempt to define the concept of "reasonable doubt" for the jury.

*Motion in Limine No. 5: PDMP; Public Records Exception (Preliminarily Unopposed)*

In 2009, the Wisconsin legislature passed Act 362, directing the Pharmacy Examining Board to create a program to monitor the dispensing of prescription drugs, which yielded Wisconsin's Prescription Drug Monitoring Program (or PDMP). Wisconsin's PDMP requires pharmacies or practitioners to generate records documenting each dispensing of a monitored prescription drug. *See generally* Wis. 961.385. Pursuant to that statute, the Controlled Substances Board promulgated extensive Administrative Rules detailing the requirements for the entry and retention of data into the PDMP. *See generally* Wis. CSB Chapter 4. Wisconsin's PDMP is administered by the Wisconsin Department of Safety and Professional Services (DSPS).

As part of the investigation of this case, the Government obtained PDMP data for filled prescriptions for controlled substances written by Whelan. Because this PDMP data is a record of a public office that sets out a "matter observed while under a legal duty to report," the PDMP is admissible under the "public records" exception to the hearsay rule. Fed. R. Evid. 803(8)(A)(ii); *United States v. Merrill*, 513 F.3d 1293, 1302 (11th Cir. 2008). Indeed, PDMP data, which exists all over the country, is routinely admitted into evidence. *See, e.g.*, *United States v. Fuhai Li*, 2019 WL 1126093, *8-9 (M.D. Pa. March 12, 2019).

This makes sense because PDMP data sets are widely accepted in the medical profession as reliable,[1] and are used as a standard part of medical care in the pain-

---

[1] That isn't to say, of course, that the PDMP is infallible. Because it is a system of data input by human beings, there is undoubtedly the potential for error. But, given what the pharmacists are doing, the most acute potential for error would be that a pharmacist would neglect to input a prescription that was filled,

11

management and addiction-treatment industries. Indeed, records reflect that Whelan and Montezon would refer to PDMP data during the time periods implicated by the instant charges.

Given that the PDMP data is recorded by a public office pursuant to a matter they observe as required by law, the records fall under the public records exception to the hearsay rule. And because Whelan has himself utilized this data, and evidence will show that such reliance is standard in the medical field, there is no basis upon which Whelan could show that the source of information or other circumstances "indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(A)(ii). There is, therefore, no reason to waste time at trial with the testimony of a records custodian from DSPS. Instead, this Court should find that the records satisfy the "public records" exception to the hearsay rule and deem the records admissible.

*Motion in Limine No. 6: Business Records Exception (Preliminarily Unopposed)*

At trial, the government anticipates moving to admit records produced by the following entities, pursuant to the "business records" hearsay exception under Federal Rule of Evidence 803(6): MoneyGram; Western Union; Barclay's; American Express; Wells Fargo; JP Morgan Chase; TCF Bank; Fond du Lac Credit Union; U.S. Bank; Bank of the West; BMO Harris; Landmark Credit Union; RIA Financial Services; WalMart; Discover; Capitol One; Citibank; Ally Bank; and Affiliated Counseling Center.

---

not that they would add prescriptions that weren't filled into the system. Given that Whelan is charged with writing medically unnecessary prescriptions, any error that would exclude a controlled substance prescription from his history can only inure to his benefit in this case.

Rule 803(6) provides that "[a] record of an act, event, condition, opinion, or diagnosis" is not excluded as inadmissible hearsay if "the record was made at or near the time by – or from information transmitted by – someone with knowledge;" the record was kept in the course of a regularly conducted activity of a business; and "making the record was a regular practice of that activity." Business records of this sort may be introduced "without foundation testimony from the record custodian so long as the records are authenticated according to Fed. R. Evid. 902(11)." *United States v. Klinzing*, 315 F.3d 803, 805 (7th Cir. 2003).

Under Rule 902(11), "a party may authenticate a business record through a written declaration by a qualified custodian that the record meets the necessary foundational requirements, but the party intending to offer the record must provide written notice of that intention to all adverse parties, and . . . make the record and declaration available for inspection sufficiently in advance of their offer into evidence to provide an adverse party with a fair opportunity to challenge them." *United States v. Bledsoe*, 70 Fed. App'x 370, 373 (7th Cir. 2003) (internal quotations omitted).

Thus, under Rule 803(6), the parties can "avoid the expense and inconvenience of producing time-consuming foundation witness testimony in situations where the authenticity of the business records could be confirmed by written declarations pursuant to Rules 902(11)-(12)." *Klinzing*, 315 F.3d at 809.

In this case, the United States has given the defendant adequate notice of its intent to offer the above-referenced records under Rule 803(6). *See Bledsoe*, 70 Fed. App'x at 373 (notice four days before trial was adequate). In accordance with Rule

13

902(11), the written certifications accompanying each record expressly indicate those records satisfy the foundational requirements of Rule 803(6)(A)-(C). The United States long ago produced the above-referenced records and certifications to defense counsel. Finally, neither the records nor the accompanying certifications exhibit any indicia of untrustworthiness, nor has defense counsel cast any meaningful doubt on the trustworthiness of these items in the time since they first possessed them. Accordingly, the government requests that the Court be prepared at trial to admit the above-referenced records without the need for authenticating testimony from a live witness.

*Motion in Limine No. 7: Defendant's Expert Witness*

The defense has identified Dr. Gerald Shiener as a potential expert witness in support of an insanity defense. Dr. Shiener's analysis is factually and legally insufficient to support such a defense because it: (1) fails to state a reliable opinion as to Defendant Whelan's mental condition *at the time of the alleged offenses*; (2) lacks any scientific facts or data to support a purported diagnosis of dementia during the relevant time period; and (3) improperly renders an opinion as to the ultimate legal question. These deficiencies in analysis are compounded by the fact that the disclosure of Dr. Shiener's opinion fails to comport with Rule 16.

Because Dr. Shiener's opinions are insufficient to support an insanity defense and because his report does not comply with Rule 16, this Court should exclude his testimony.

14

A. The Law of Expert Witnesses

With respect to expert testimony, the federal district courts act as "gatekeepers" to ensure that it is reliable and helpful to the jury. *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 877 (7th Cir. 2021) (affirming exclusion of expert report). "The primary locus of this obligation is Rule 702." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). Rule 702, as amended in 2000, codified the Supreme Court's holding in *Daubert*. It reads:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b)    the testimony is based on sufficient facts or data;
> (c)    the testimony is the product of reliable principles and methods; and
> (d)    the expert has reliably applied the principles and methods to the facts of the case.

In performing its role "as an evidentiary gatekeeper," the "district court must engage in a three-step analysis before admitting expert testimony. It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (internal quotation omitted). The proponent of expert testimony has the burden of demonstrating that its expert's opinions are reliable. *Id.*

To help ensure that proffered expert testimony meets these standards, Federal Rule of Evidence 16 provides that where, as here, "the defendant has given notice under

15

Rule 12.2(b) of an intent to present expert testimony on the defendant's mental condition," the defendant must provide the government with a disclosure that contains "a complete statement of all opinions that the defendant will elicit from the witness in the defendant's case-in-chief; the bases and reasons for them; the witness's qualifications, including a list of all publications authored in the previous 10 years; and a list of all other cases in which, during the previous 4 years, the witness has testified as an expert at trial or by deposition."

These Rule 16 requirements serve substantive ends. The Advisory Committee Notes explain that the rule is "intended to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Courts have, for these reasons, excluded expert testimony when these requirements are not met. *United States v. Hofecker*, 530 F.3d 137, 186 (3d Cir. 2008) (affirming preclusion of defendant's expert based on violation of Rule 16's disclosure requirements).

### B. Experts & the Insanity Defense

In 1984, Congress passed the Insanity Defense Reform Act, making it "an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts," and explaining that "[m]ental disease or defect does not otherwise constitute a defense." 18 U.S.C. § 17(a).

Federal Rule of Evidence 704(b) governs evidence related to this defense. *See United States v. Watson*, 260 F.3d 301, 308 (3d Cir. 2001) ("Rule 704(b) applies to all instances in which expert testimony is offered as to mental state or a condition constituting an element of the crime charged or defense thereto."). The Rule states: "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense" because "[t]hose matters are for the trier of fact alone." As the Seventh Circuit explained: "The purpose of Rule 704(b) is to have jurors decide whether the defendant was sane or not without being told what conclusion an expert might draw." *United States v. West,* 962 F.2d 1243, 1247 (7th Cir. 1992).

*United States v. Diekhoff*, 535 F.3d 611 (7th Cir. 2008), is instructive here. In that case, the court noted that "[w]hen a psychiatrist testifies as to her assessment of the defendant's sanity, she must toe the line between providing insight into the defendant's mental state and actually indicating whether she thinks the defendant is insane." *Id.* at 619. An "expert can set out her medical and psychological knowledge regarding the mental disease or defect that may affect the defendant because this information helps the jury understand mental illness and its symptoms and effects." *Id.* (cleaned up). But that same psychiatrist "cannot say or give an obvious inference that she thinks that the mental illness clouded the defendant's ability to distinguish right from wrong." *Id.* (internal citation omitted). Testimony of this sort "would involve a legal conclusion (or more accurately a fact-law conclusion), and experts cannot make those." *Id.* (citation omitted).

17

*Diekhoff* is echoed in other federal courts, which have similarly identified the "strong danger of misuse" inherent to expert psychiatric testimony and "directed district courts to examine proffered psychiatric testimony carefully to determine whether the proof offered is grounded in sufficient scientific support to support use in the courtroom, and whether it would aid the jury in deciding the ultimate issues." *United States v. Pohlot*, 827 F.2d 889, 896-97 (3d Cir. 1987).

These decisions are particularly focused on problems inherent to expert psychiatric testimony that looks back years to speculate about a defendant's mental state at the time of the charged conduct. *See United States v. Day*, 524 F.3d 1361, 1370 (D.C. Cir. 2008) (excluding defense expert in support of insanity defense, as that expert did nothing more than "surmise or speculate" regarding time periods predating exam); *United States v. Cameron*, 907 F.2d 1051, 1067 (11th Cir. 1990) (affirming exclusion of defense's expert, as testimony "offered as psychiatric evidence to negate specific intent is admissible [only] when such evidence focuses on the defendant's specific state of mind *at the time of the charged offense*") (cleaned up and emphasis added); *United States v. Orlansky*, No. 03-20951-CR, 2006 WL 8434739, at *1 (S.D. Fla. Feb. 27, 2006) (excluding defendant's experts as neither was "able, with any degree of medical or scientific certainty, to opine that [defendant] suffered from dementia with significant cognitive loss *during the time period covered by the superseding indictment*") (emphasis added); *United States v. Baxt*, 74 F. Supp. 2d 436, 440 (D.N.J. 1999) ("Expert testimony is admissible only when it is proffered to demonstrate that a defendant actually lacked the requisite *mens rea at the time an alleged offense was committed* . . . . Conclusory statements by a defendant

18

about the link between psychiatric evidence and the defendant's *mens rea* at the time the alleged crime was committed do not render the evidence admissible.") (cleaned up and emphasis added).

### C. Dr. Shiener's Proffered Opinion Cannot Support an Insanity Defense

In October 2022, the defense provided the government with a report from Dr. Shiener, which was referenced in its Rule 12.2 insanity notice. *See* Dkt. No. [65]. The Court also has access to a sealed version of that same report. *See* Dkt. No. [101-2].

In that document, Dr. Shiener describes how he met with Defendant Whelan once, years after Whelan committed the offenses described in the indictment. *Id.* During that meeting, Dr. Shiener administered three screening tests, which did not contain internal validity measures, took approximately fifteen minutes each, and yielded variable results. *Id.* Dr. Shiener did not, at that time, review any of Whelan's medical records. *Id.*

Based on this limited evidence, Dr. Shiener opined, *inter alia*, that Whelan was suffering from "Frontotemporal Dementia," a significant and rapidly progressive form of the disease. *Id.* The majority of Dr. Shiener's report is focused on this diagnosis. *Id.* In other words, nearly all of Dr. Shiener's opinion relates to his *present*-day diagnosis of Whelan. He writes, for example, that "Dr. Whelan is *presently suffering* from mental disease and defect" and opines that "he *is* suffering from a neurocognitive disturbance." *Id.* (emphasis added). The report does not, however, even imply the supposed date of onset of the disease. Nor does it explain how the disease typically progresses in the general population, much less how it progressed in Whelan's case, specifically.

19

Despite these deficiencies, Dr. Shiener concludes his report by stating, without support or explanation, that Whelan's *current* diagnosis of frontotemporal dementia made him "unable to appreciate the wrongfulness of his acts" *five* years ago. That is, frankly, not enough. Indeed, courts have made clear that experts who merely speculate as to the onset of a cognitive disorder or who are "not able to put a date (even an approximate one) on the onset of [defendant's] dementia with any reliable medical or scientific basis" cannot be allowed to testify in support of an insanity defense. *United States v. Orlansky*, 2006 WL 8434739, at *1 (S.D. Fla. Feb. 27, 2006); *see also United States v. Day*, 524 F.3d 1361, 1370 (D.C. Cir. 2008).

That is the case here. Dr. Shiener's report fails to even approximate a date of onset for Whelan's purported dementia. And his testimony at the competency hearing makes plain that he *cannot* do so. *See e.g.*, Dkt. No. [107] at 162:6-162:11 (noting that a 2019 incident was "consistent with dementia, and it was indicative that something was wrong" but declining to opine that Whelan *had* dementia in 2019); *id.* at 162:12-163:13 (implying, but declining to conclude, that the onset of Whelan's dementia *could* have been 2008); 117-119; 123-124 (focusing on a 2020 CT Scan and other 2020 hospital visits as supportive, though not definitive, evidence of a diagnosis of dementia *at the end* of the conspiracy period); 170:18-171:8 (making clear that Dr. Shiener has not opined as to the date of onset for Whelan's purported dementia).

This Court should, therefore, exclude his testimony in its entirety.

20

<u>D. Dr. Shiener's Report & Rule 16</u>

In addition to failing to support the presentation of an insanity defense, Dr. Shiener's report fails to fulfill certain Rule 16 requirements. Indeed, the report does not identify Dr. Shiener's publications over the last ten years or list all the cases over the last four years in which Dr. Shiener has testified. *See* Dkt. No. [101-2]. These requirements are especially important where, as here, the proffered expert's opinions have been repeatedly rejected by other courts. *See, e.g.*, *United States v. Kliebert*, 508 F. App'x 535, 541 (6th Cir. 2012) (any arguments based on Dr. Shiener's report would be "meritless," and his report contained a "clearly erroneous statement"); *Gohl v. Turbiak*, No. 335389, 2018 WL 2067796, at *10 (Mich. Ct. App. May 3, 2018) (Dr. Shiener's opinion is "conclusory, unsubstantiated, and based on facts contrary to the record").

The government also suspects that the proffered report fails to provide "a complete statement of all opinions" Whelan intends to elicit from Dr. Shiener at trial, given that several topics Dr. Shiener testified to during the September 11 competency hearing—including Dr. Shiener's analysis of Whelan's medical records; the purported difficulty doctors experience when treating other doctors; Dr. Shiener's views as to the interviewing skills exhibited by lawyers and doctors; Dr. Shiener's views as to whether general practitioners/primary care physicians are well equipped to detect neurological problems; Dr. Shiener's views as to whether emergency room physicians are well equipped to detect neurological problems; and Dr. Shiener's analysis of Dr. Swanson's testing data—are not discussed in Dr. Shiener's report at all. *Compare* Dkt. No. [101-2]

21

(report not discussing these topics) *with* Dkt. No. [107] at 63:10-63:11; 110:8-111:18; 101:19-102:24; 117:25-118:3; 125:17-126:17 (Dr. Shiener's testimony about these topics).

The defense's failure to comply with Rule 16 is additional grounds for wholesale exclusion of Dr. Shiener's testimony. *See United States v. Day*, 524 F.3d 1361, 1372 (D.C. Cir. 2008) ("not an abuse of discretion for the District Court to conclude that the appropriate sanction for the Rule 16 violation was the exclusion of" defense expert's testimony; indeed, "exclusion of evidence and testimony can be a proper sanction, even against a criminal defendant").

E. Dr. Shiener's Opinion & Rule 704

If the Court ultimately allows Dr. Shiener to testify despite the legal and factual deficiencies in his opinion and its disclosure, the Court should nevertheless preclude him from testifying as to his ultimate conclusion about whether Whelan was able to appreciate the wrongfulness of his acts.

*Diekhoff* is clear on this point: Dr. Shiener "cannot say" to the jury that he believes Whelan was unable to appreciate the wrongfulness of his acts. 535 F.3d at 619. Instead, at most, Dr. Shiener can provide the jury with background information about Defendant Whelan's current purported mental defect and its symptoms, while leaving for the jury the ultimate determination as to Whelan's sanity. *Id.*

F. Conclusion

The Court should exclude Dr. Shiener's testimony entirely, given its unreliability and the defense's Rule 16 failures. If, however, the Court permits Dr. Shiener to testify, it should ensure that (i) Dr. Shiener's testimony will be limited to opinions that have

been appropriately disclosed; and (ii) Dr. Shiener is precluded from offering an impermissible opinion as to whether Whelan appreciated the wrongfulness of his conduct.

The parties met and conferred regarding this request, and defense counsel indicated: (i) they were unsure whether they would be calling Dr. Shiener to testify at trial; and (ii) if they did call Dr. Shiener at trial, they planned on disclosing an updated report. The parties will continue to discuss this issue.

*Motion in Limine No. 8: Government's Expert Witnesses*

The government, for its part, intends to call two expert witnesses at trial: Dr. Sara Swanson and Dr. Andrew Chambers.

Dr. Swanson is, as the Court knows, a mutually-agreed-upon neuropsychologist who assessed Whelan's sanity during the time period referenced in the indictment. *See* Dkt. No. [92]. After thoroughly reviewing Whelan's medical records, interviewing Whelan on two separate days, subjecting Whelan to a battery of validity-tested psychological examinations, and reviewing Dr. Shiener's report, Dr. Swanson concluded that Whelan likely had the ability to appreciate the nature and wrongfulness of his acts through 2020. *Id.* The government has tendered to defense counsel a fulsome disclosure regarding Dr. Swanson's anticipated testimony that comports with the Rule 16 requirements, and defense counsel has voiced no objection to Dr. Swanson offering testimony consistent with her report. Accordingly, the government requests that the Court be prepared at trial to allow Dr. Swanson to testify regarding the analysis commemorated in her report.

23

Dr. Chambers is a tenured professor of psychiatry at the Indiana University School of Medicine. He is board-certified in general psychiatry, addiction medicine, and addiction psychiatry. He is the Director of Indiana University's Addiction Psychiatry Fellowship Training Program. Dr. Chambers also reviewed materials related to this case, including undercover videos of Whelan at the "clinic." Based on his expertise and review of that evidence, Dr. Chambers concluded that Whelan's behavior was "totally outside of any legitimate medical purpose or standards of care," and represented "a significant public health threat." The government has tendered to defense counsel a fulsome disclosure regarding Dr. Chambers's anticipated testimony that comports with the Rule 16 requirements, and defense counsel has voiced no objection to Dr. Chambers offering testimony consistent with his report. Accordingly, the government requests that the Court be prepared at trial to allow Dr. Chambers to testify regarding the analysis commemorated in his report.

The parties met and conferred regarding this request, and defense counsel indicated they cannot agree to the same at this time, though the parties will continue to discuss the issue in the hopes of reaching agreement.

*Motion in Limine No. 9: Impeachment of Victim-Customers (Preliminarily Unopposed)*

The government anticipates eliciting testimony from various customers who purchased illicit prescriptions from Whelan and Montezon. Certain of these customers have criminal histories. These customers, however, are also vulnerable victims of Whelan's crimes, whose sobriety is both hard-won and fragile. The government accordingly requests that the Court order that before any party questions any witness

about their criminal history, that same party be required to raise the issue outside the jury's presence, so the Court might outline the appropriate scope of that questioning, consistent with the familiar requirements of Federal Rules of Evidence 403 and 609.

*Motion in Limine No. 10: Defendant's Self-Serving Statements*

Whelan has made multiple statements to agents and other witnesses in this case, both exculpatory and inculpatory. The former are inadmissible hearsay. The latter, when offered by the United States, are admissible as admissions of a party opponent. *See* Fed. R. Evid. 801(d)(2).

Indeed, a defendant's exculpatory statements are inadmissible hearsay even when they are made contemporaneously with other self-inculpatory statements. *See Williamson v. United States*, 512 U.S. 594, 599 (1994) (finding "[t]he fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts"); *Stock v. Rednour*, 621 F.3d 644, 649 (7th Cir. 2010) (noting the "basic evidentiary principle that self-serving, out-of-court statements are inadmissible for the purpose of exculpating the declarant"); *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000) (affirming district court's decision to preclude defendant from "eliciting his own exculpatory statements, which were made within a broader, inculpatory narrative").

This principle holds for statements made by the defendant to expert witnesses. To be clear, the federal rules allow an expert to rely upon otherwise inadmissible evidence, such as hearsay, if the evidence is of the type reasonably relied upon by experts in the same field. *See* Fed. R. Evid. 703. This rule does not, however, make

25

otherwise inadmissible evidence admissible. And no exception to the hearsay rule permits a defendant to introduce his own self-serving out-of-court statements.

In this case, Dr. Shiener's disclosed report reiterates self-serving statements by Whelan, to include the following: "I didn't think I was doing anything wrong." *See* Dkt. No. [101-2]. The defense should not be allowed to backdoor this statement and others of its ilk through Dr. Shiener, in the event Dr. Shiener is allowed to testify.

Although Rule 703 allows experts to rely on inadmissible evidence such as hearsay in forming opinions, the rule is clear that the evidence relied upon must be of the type generally relied upon by experts in the field. In determining whether an expert properly relied on inadmissible information, "the trustworthiness of the underlying data is not irrelevant." *Gong v. Hirsch*, 913 F.2d 1269, 1273 (7th Cir. 1990). For example, in *Gong*, the Seventh Circuit held that a medical expert could not rely on a letter written by another physician concerning the cause of an ulcer suffered by the plaintiff because the physician who wrote the letter was not the plaintiff's treating physician, the letter was written to help the plaintiff receive disability benefits, and the source of the information was likely the plaintiff himself. *Id.* "Given the obvious concern over the trustworthiness of a statement made under circumstances such as these, we cannot say that the district court abused its discretion in preventing the plaintiff's medical expert from reading from Dr. Schleinkofer's letter or otherwise stating that his opinion was based on the letter." *Id.*

In this case, Dr. Shiener has not indicated how Whelan's self-serving statements are reasonably relied upon in formulating an opinion as to whether Whelan suffers

from frontotemporal dementia. And even if Dr. Shiener could proffer a manner in which a psychiatrist could reasonably rely on the self-serving statements of a defendant-psychiatrist whose conduct is at issue, Rule 703 only allows experts to rely upon hearsay to form an opinion. It does not permit an expert to simply regurgitate hearsay evidence in the form of an opinion and thereby render otherwise inadmissible evidence admissible.

Indeed, courts have frequently cautioned that parties should not be permitted to use expert witnesses to "circumvent the hearsay rule" by introducing otherwise inadmissible hearsay statements via expert testimony. *See, e.g.*, *Robenhorst v. Dematic Corp.*, 2008 WL 1766525, at *9-11 (N.D. Ill. April 14, 2008); *Loeffel Steel Prod., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005), amended, No. 01 C 9389, 2005 WL 8178971 (N.D. Ill. Sept. 8, 2005) ("[W]hile Rule 703 was intended to liberalize the rules relating to expert testimony, it was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion.").

Where admissions are concerned, what is good for the goose is not good for the gander. The United States accordingly requests that the Court rule that the government may introduce Whelan's inculpatory statements, but Whelan may not introduce his own non-inculpatory ones, which are inadmissible hearsay even if offered by defendant's expert.

The parties met and conferred regarding this request, and defense counsel indicated they cannot agree to the same at this time, though the parties will continue to discuss the issue in the hopes of reaching agreement.

Dated at Milwaukee, Wisconsin, this 21st day of September, 2023.

Respectfully submitted,

Gregory J. Haanstad
United States Attorney

By:     */s Julie Stewart*
        */s Kevin Knight*

Julie Stewart
Kevin Knight
United States Attorney's Office
517 E. Wisconsin Ave - Rm 530
Milwaukee, WI 53202
Phone: 414.297.1700